2016 IL App (3d) 150238

Opinion filed September 27, 2016

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2016

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| KATHLEEN LISZKA, | ) | Will County, Illinois. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Appeal No. 3-15-0238 |
| and | ) | Circuit No. 12-D-225 |
| | ) | |
| MICHAEL LISZKA, | ) | The Honorable |
| | ) | Victoria M. Kennison, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE LYTTON delivered the judgment of the court, with opinion.
Justice Wright concurred in the judgment and opinion.
Justice McDade concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1 Petitioner Kathleen Liszka filed a dissolution of marriage action against respondent Michael Liszka. Prior to trial, the court barred Michael's expert from testifying as to the value of a corporation owned by the parties, ISP Painting Inc. (ISP), as a discovery sanction. In its judgment for dissolution, the court divided the marital estate equally between the parties, awarding ISP and the marital home to Kathleen and requiring her to pay Michael $673,785. The court denied Michael's request for maintenance, imputed monthly income of $17,500 to him for

child support purposes, and imposed a trust for child support payments. After ruling on the parties' motions for reconsideration, the trial court reduced the amount Kathleen was to pay Michael to $84,007.50.

¶ 2 Michael appeals, arguing that the trial court erred in (1) barring his expert from testifying as to the value of ISP, (2) denying his motion to continue the trial, (3) imputing income to him, (4) valuing ISP, (5) not dividing ISP's 2013 retained earnings, (6) assigning no value to another business owned by the parties, (7) failing to treat Kathleen's attorney fees as advances from the marital estate, (8) valuing the marital home, (9) refusing to reopen the proofs to allow the introduction of ISP's 2013 tax returns, (10) denying him rehabilitative maintenance, and (11) establishing a trust for his child support payments. We reverse those parts of the trial court's order that bar Michael's expert from testifying and that impute monthly income of $17,500 to him and remand for further proceedings. We affirm the trial court's decision in all other respects.

¶ 3                                            FACTS

¶ 4 Michael and Kathleen Liszka were married in 1993 and had three children together during their marriage. In 2002, Michael and Kathleen started a corporation together, ISP Painting, Inc. Kathleen owned 51% of ISP, and Michael owned 49%. They both served in various roles at ISP throughout their marriage. In 2011, Michael was the chief financial officer (CFO), and Kathleen was president of ISP.

¶ 5 In 2011, Michael and Kathleen entered into a collaborative divorce process. As part of that process, they hired Christiana Zouzias, a certified public accountant, to value ISP. In 2012, the collaborative process broke down, and Kathleen filed a petition for dissolution of marriage. She sought sole custody of the parties' children, who were 14, 12, and 10 years old at the time. In June 2012, Kathleen placed Michael on administrative leave from ISP but continued to pay

2

him an annual salary of approximately $210,000. Both parties filed motions alleging dissipation of assets by the other party.

¶ 6    In April 2013, the trial court set the trial for custody and property matters to take place on October 21, 2013. In April 2013, Kathleen sent Michael financial documents related to ISP. On May 20, 2013, Michael filed a motion to compel production of unredacted documents, arguing that the documents Kathleen sent him contained redacted data that interfered with his ability to determine the value of ISP. The trial court entered an order requiring Kathleen to provide the documents in unredacted form subject to a protective order.

¶ 7    On August 12, 2013, Kathleen disclosed her trial witnesses, including Zouzias as her valuation expert. On August 14, 2013, Kathleen sent Michael some unredacted financial records. Soon thereafter, Michael disclosed Mary Lynn Hoffer as his ISP valuation expert but did not provide any of her conclusions or opinions and indicated that her report would "be available prior to trial." On that same date, Michael filed another motion to compel the production of unredacted documents, asserting that Kathleen failed to send him certain balance sheets, financial statements, and general ledgers for ISP. On August 29, 2013, Kathleen sent Michael unredacted copies of the financial statements and ledgers he requested. On September 26, 2013, Kathleen sent Michael the 2012-13 balance sheets for ISP.

¶ 8    On October 17, 2013, Michael provided Hoffer's report to Kathleen. Kathleen filed a motion to bar Hoffer's report and testimony because Michael did not provide her report or disclose her opinions by the discovery deadline. The trial court granted Kathleen's motion.

¶ 9    On October 21, 2013, Michael filed a "motion to continue property/financial portion of trial due to discovery abuses by petitioner." At the hearing on the motion, Kathleen's attorney, Paul Starkman, testified that he provided redacted financial records to Michael in October 2012

and April 2013, including profit and loss statements and general ledgers. He testified that he redacted only the names of ISP's customers, which he considered confidential. On August 28, Starkman provided Michael with unredacted financial information, including general ledgers for 2011 and 2012, profit and loss statements, and some balance sheets. On September 26, 2013, Starkman provided Michael with the unredacted balance sheets for 2012 and 2013.

¶ 10     Phil McLawhorn, the accounting manager of ISP, testified that in August 2013, he provided financial documents to Michael, including a balance sheet and a profit and loss statement. On August 28, 2013, he provided Michael with general ledgers for 2011 and 2013. On September 26, 2013, McLawhorn provided Michael with the balance sheet for 2012, as well as the updated balance sheet for 2013. The trial court denied Michael's motion to continue.

¶ 11     Right before trial, the parties settled their custody dispute, leaving only property issues to be decided by the court. At trial, Michael testified that he is a healthy 44-year-old. He has a college degree with a major in financing. Before starting ISP, Michael started a local painting company, Illinois State Painters, in 1987. At ISP, Michael served as human resources manager, marketing director, finance director, president, chief executive officer (CEO), and CFO.

¶ 12     In addition to ISP, Michael and Kathleen owned several other businesses, including Coreman Technologies. Coreman Technologies operates an extranet system that is used by ISP and two other customers. The extranet system was developed and paid for by ISP. ISP created Coreman to market the extranet to other companies. Coreman has no employees. Coreman does not file taxes. Coreman's earnings are included in ISP's earnings for tax purposes. Coreman's earnings were $1320 in 2010, $21,718 in 2011, $4695 in 2012, and $3205 in 2013. Michael estimated that Coreman's value was $500,000 based on its "possible future." Kathleen testified that she did not know the value of Coreman. She testified that Coreman's only assets are its

4

name and its ability to use and sell extranet software. Coreman does not have any copyrights, patents, or trademarks for its software. Louis Miller, ISP's Director of Financing, testified that Coreman does not have a bank account separate from ISP's. According to Miller, Coreman is not separate from ISP.

¶ 13    At trial, Zouzias testified that the value of ISP was $1,116,000 as of December 31, 2011. At Michael's request, Zouzias looked at ISP's 2012-13 financial information but did not perform a complete analysis for those years. The 2012-13 information confirmed Zouzias's belief that her 2011 valuation was correct. She did not have an opinion regarding the value of ISP as of 2012 or 2013 because she did not perform a complete business valuation for those years. Michael testified that ISP's value was $4,037,817 in 2012 and $5,047,902 in 2013 based on financial information from the first half of the year. He testified that he was offered $2,000,000 for ISP in 2005 or 2006 and that it has substantially grown in value since then.

¶ 14    Both parties provided evidence regarding the value of the marital home. Kathleen presented a copy of an appraisal, performed on August 5, 2011, stating that the home had a value of $565,000. Kathleen testified that she believed the fair market value of the home was $420,000. Michael presented an appraisal of the home performed on March 12, 2012, indicating that the value of the home was $615,000. Michael testified that he believed the value of the home at the time of trial was $691,000.

¶ 15    Michael alleged that Kathleen dissipated marital assets, in part, by paying excessive attorney fees. Peggy Tracy, a forensic accountant hired by Michael, testified that Kathleen spent $228,400 more in attorney fees than Michael. Kathleen disputed Tracy's testimony and testified that she spent only $78,982 more than Michael in attorney fees.

5

¶ 16    The trial ended on January 24, 2014, at which time the court gave an oral ruling that grounds existed for dissolution of the parties' marriage. The court reserved the issue of child support for six months.

¶ 17    In March 2014, Michael filed a "motion to reopen proofs as to ISP, Inc. valuation and allocation of retained earnings." Attached thereto was ISP's 2013 tax return. The trial court denied the motion.

¶ 18    On April 16, 2014, the trial court entered its written judgment for dissolution of marriage. The court found that the value of the marital home was $577,000 based on Kathleen's 2011 appraisal and improvements in the market. Kathleen was awarded the marital home and ordered to pay Michael for his share. The court accepted Zouzias's business valuation of ISP, finding that the date of her valuation "is still reasonably close enough toward the time of trial that it is an acceptable amount." The court awarded ISP to Kathleen and ordered her to pay Michael $558,000 for his interest. The court rejected Michael's valuation of ISP, finding it "was fraught with errors." The court awarded Coreman Technologies to Kathleen and ordered her to pay Michael $250,000 for his interest in it.

¶ 19    The court denied both parties' claims of dissipation. The court found that Kathleen's attorney fees were more than Michael's "but, because of the situation that we have here and how this started as a collaborative effort and with no requirement that there be an equalization as to attorneys' fees, the Court is not going to equalize the attorneys' fees."

¶ 20    The court denied Michael's request for maintenance after reviewing the applicable statutory factors. The court explained: "Both parties are walking away now with significant assets, some in property and some in cash. Both parties have significant earning capacity and they are both working people."

6

¶ 21　　　　The court divided the marital estate equally between the parties, awarding Michael two Hawaii timeshares, personal property, bank accounts, retirement accounts, and two vehicles. In order to accomplish the 50/50 split, Kathleen was required to pay Michael $673,785.

¶ 22　　　　On the same day the court entered its judgment, Kathleen terminated Michael from ISP. Michael then filed a petition for equitable maintenance, and Kathleen responded with a motion for a directed finding that Michael was not entitled to maintenance. At a hearing on his petition, Michael testified that he had expenses totaling $17,500 per month, including over $10,000 in living expenses and $7000 in attorney fees. He had been withdrawing money from his 401(k) accounts to support himself since his termination from ISP. The trial court granted Kathleen's motion and denied Michael's petition for maintenance.

¶ 23　　　　In June 2014, Kathleen filed a petition to set child support. Michael responded to the petition by denying that he is "well able and capable of contributing to the support of the minor children." Kathleen also filed a petition for imposition of a trust, pursuant to section 503(g) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(g) (West 2012)), for the benefit of the children. The trial court held a hearing on the petitions. At the hearing, Michael testified that since he was terminated from ISP in April 2014, he has been "trying to start [his] own company." His new company was incorporated in October 2014, and, according to his business plan, he will be paying himself an annual salary of $40,000, plus bonuses. He asked the trial court to set child support based on that salary.

¶ 24　　　　In December 2014, the trial court issued its oral ruling on Kathleen's petitions, finding that Michael is "voluntarily unemployed" and "unwilling to pay the necessary support for his children." The trial court imputed income to Michael in the amount of "$17,500 per month

7

which is the amount that he was living off of and using." The trial court also granted Kathleen's request for imposition of a section 503(g) trust.

¶ 25    In February 2015, the trial court entered a written order requiring Michael to pay $3765 in child support per month based on his imputed monthly income of $17,500. The order granted Kathleen's request for a 503(g) trust, finding that Michael "has not acted in good faith, that he has in fact been trying to avoid meeting his obligations to fully support the children as necessary." The court ordered that $200,000 of the amount Kathleen owed Michael be placed in the trust.

¶ 26    Both parties filed motions to reconsider the judgment for dissolution. The court denied Michael's motion but partially granted Kathleen's motion, reassigning three bank accounts to ISP instead of the parties and ruling that Coreman had no value because it is part of ISP and its value, if any, was included in ISP's value. The court also determined that it "double counted" certain assets and accounts. After the court's modifications, the total value of the marital estate decreased by $1,179,553, and the amount Kathleen was required to pay Michael decreased from $673,785 to $84,007.50.

¶ 27                                    ANALYSIS

¶ 28                               I. ISP's Valuation

¶ 29              A. Barring Michael's Expert and Refusing to Continue Trial

¶ 30    Supreme Court Rule 213(f)(3) requires a party to disclose, for each controlled expert witness, "(i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2007).

8

Information required by Rule 213 must normally be disclosed no later than 60 days before trial. *Gee v. Treece*, 365 Ill. App. 3d 1029, 1036 (2006).

¶ 31    Supreme Court Rule 219(c) authorizes the trial court to prescribe sanctions, including barring witnesses from testifying, when a party fails to comply with discovery deadlines. Ill. S. Ct. R. 219(c)(iv) (eff. July 1, 2002); *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 620 (2007). The imposition of sanctions is within the discretion of the trial court and will not be disturbed absent a clear abuse of discretion. *Fung*, 374 Ill. App. 3d at 620-21.

¶ 32    In determining whether the trial court abused its discretion in fashioning a sanction, the reviewing court should consider (1) the surprise to the adverse party, (2) the prejudicial effect of the witness's testimony, (3) the nature of the testimony, (4) the diligence of the adverse party, (5) the timeliness of the objection, and (6) the good faith of the party seeking to offer the testimony. *Id.* at 621. No single factor is determinative, and each case must be considered based on its unique facts. *Id.*

¶ 33    Disqualification of an expert is not the only sanction available when a party violates Illinois Supreme Court Rule 213. *Marshall v. Osborn*, 213 Ill. App. 3d 134, 141 (1991). In fact, barring a witness's testimony is a drastic sanction and should be exercised with caution. *McGovern v. Kaneshiro*, 337 Ill. App. 3d 24, 37 (2003). In some circumstances, allowing the offended party the opportunity to depose the expert may be an appropriate response to a party's failure to timely disclose. *Marshall*, 213 Ill. App. 3d at 141.

¶ 34    Where a party has acted in good faith and has not engaged in abusive discovery practices, it is an abuse of discretion for the trial court to bar expert testimony that is not timely disclosed. See *Vallejo v. Mercado*, 220 Ill. App. 3d 1, 10 (1991). The proper remedy is to continue the trial date and revise the discovery schedule. *Id.*

9

¶ 35 Here, the record shows that Michael disclosed Hoffer as a controlled expert witness more than 60 days before trial but failed to disclose her opinions and report until just 4 days before trial. However, this late disclosure was not caused by Michael's bad faith or abusive discovery practices. Rather, the late disclosure was the result of Kathleen's failure to provide Michael and his expert with necessary financial information.

¶ 36 In early 2013, Michael sought ISP's financial documents from Kathleen. While Kathleen provided some documents to Michael in April 2013, many of them were redacted, requiring Michael to file a motion to compel Kathleen to provide unredacted documents. Kathleen provided unredacted documents to Michael in August 2013 but failed to send him 2012 balance sheets, financial statements for part of the year, or general ledgers for any years, causing Michael to file another motion to compel. On August 29, 2013, Kathleen sent Michael the financial statements and ledgers he requested. However, it was not until September 26, 2013, less than 30 days before trial, that Kathleen finally provided Michael with IPS's 2012 and 2013 balance sheets. Three weeks later, Michael provided Hoffer's report to Kathleen.

¶ 37 Under these circumstances, the trial court abused its discretion in barring Hoffer's testimony. The record establishes that Michael, and by extension Hoffer, did not receive all of the relevant financial information necessary to reach a conclusion regarding ISP's value until September 26, 2013, less than a month before trial and more than a month after the August 22, 2013 discovery deadline. Because it was Kathleen's lack of diligence that caused Hoffer's report to be untimely, Michael should not have been penalized. The proper remedy would have been for the trial court to grant Michael's motion to continue and allow Kathleen time to depose Hoffer prior to trial. See *Marshall*, 213 Ill. App. 3d at 141; *Vallejo*, 220 Ill. App. 3d at 10.

¶ 38 B. Date of Valuation

¶ 39    The trial court should value marital property of the parties as of the date of the judgment dissolving the marriage of the parties. *In re Marriage of Mathis*, 2012 IL 113496, ¶¶ 24, 30. Where there are adequate financial records to permit a valuation on or near the date of judgment, the trial court should use that evidence in making its valuation. *In re Marriage of Rubinstein*, 145 Ill. App. 3d 31, 35 (1986).

¶ 40    It is the obligation of the parties in a dissolution proceeding to present the court with sufficient evidence of the value of property. *In re Marriage of Courtright*, 155 Ill. App. 3d 55, 59 (1987). A trial court can only reach its determination of value based on the evidence presented. *Id.* The valuation of assets in a dissolution of marriage action is to be resolved by the trier of fact. *In re Marriage of Grunsten*, 304 Ill. App. 3d 12, 17 (1999). As long as the court's valuation is within the range testified to by the expert witnesses, it ordinarily will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Id.*

¶ 41    Determining market value of a closely held company is not unlike the valuation process for professional corporations. *Id.* The process is inherently subjective:

> "Placing a fair market value on the professional corporation is an art, not a science, and the court must rely on expert witnesses to assist it in this difficult task. There is no exact formula that can be applied, so the trial court must rely on experts who may differ significantly in both methodology and valuation. The trial court must consider the relevant evidence before it; determine the credibility of the experts, the reasonableness of their testimony, the weight given to each of them, and their expertise in the particular area of valuation; and then determine fair market value." *In re Marriage of Gunn*, 233 Ill. App. 3d 165, 183 (1992).

11

¶ 42    Here, the trial court barred Michael's expert from testifying and prohibited him from presenting expert testimony regarding the value of ISP. As a result, the court was left only with the expert testimony of Zouzias regarding the value of ISP. While Zouzias valued ISP as of 2011, which was several years before the judgment of dissolution, it was not error for the trial court to rely on Zouzias's valuation because it was the only expert valuation before the court. See *Courtright*, 155 Ill. App. 3d at 59. Nevertheless, on remand, the court should allow both Michael's and Kathleen's experts to present evidence to aid the court in determining the value of ISP on the date of dissolution. See *Mathis*, 2012 IL 113496, ¶¶ 24, 30; *Rubinstein*, 145 Ill. App. 3d at 35.

¶ 43                                    II. Imputing Income to Michael

¶ 44    Trial courts have authority to impute income to a voluntarily unemployed or underemployed noncustodial parent for child support purposes. *Melamed v. Melamed*, 2016 IL App (1st) 141453, ¶ 36; *In re Marriage of Adams*, 348 Ill. App. 3d 340, 344 (2004). In order to impute income to a party, the court must find that the payor is voluntarily unemployed, is attempting to evade a support obligation, or has unreasonably failed to take advantage of an employment opportunity. *In re Marriage of Gosney*, 394 Ill. App. 3d 1073, 1077 (2009).

¶ 45    If a party is not making a good-faith effort to earn sufficient income, the court may set a support obligation at a level higher than the parent's actual income, as long as the award is appropriate based on the party's skills and experience. *In re Marriage of Sweet*, 316 Ill. App. 3d 101, 107 (2000). "It is well established that courts have the authority to compel parties to pay child support at a level commensurate with their earning potential." *Gosney*, 394 Ill. App. 3d at 1077. In determining a party's earning capacity, the court should examine (1) the work and earnings history of the parent, (2) the parent's educational background, (3) the parent's

12

occupational qualifications, and (4) prevailing job opportunities in the geographic area. *Caplan v. Caplan*, 864 A.2d 1108, 1117 (N.J. 2005); *Claborn v. Claborn*, 673 N.W.2d 533, 540 (Neb. 2004).

¶ 46 The amount of income imputed by the court must be supported by evidence showing that it is commensurate with the supporting parent's skills and experience. See *In re Parentage of M.M.*, 2015 IL App (2d) 140772, ¶ 44. In determining a party's earning capacity, a court should only consider evidence presented, not mere speculation. See *In re Marriage of Harlow*, 251 Ill. App. 3d 152, 159 (1993). A trial court may rely on the testimony of vocational experts regarding the amount of income the payor could reasonably be expected to earn based on education and experience. See *In re Marriage of S.D.*, 2012 IL App (1st) 101876, ¶¶ 36-37.

¶ 47 When calculating the amount of income to impute, the trial court may consider the supporting parent's income from previous employment. See *In re Marriage of Hubbs*, 363 Ill. App. 3d 696, 706 (2006); *In re Marriage of Carpel*, 232 Ill. App. 3d 806, 819 (1992). However, a court should not base its income calculation on outdated data that no longer reflect prospective income. *Carpel*, 232 Ill. App. 3d at 819. Evidence that the obligor once earned a certain salary and presumably could again is an insufficient basis upon which to impute income. *In re Marriage of Berger*, 88 Cal. Rptr. 3d 766, 774 (2009). A trial court may not impute income in the amount of an obligor's prior income where the obligor has been involuntarily terminated from his prior employment and there is no evidence that a job with the same salary is available to him. See *Gosney*, 394 Ill. App. 3d at 1078. A trial court's determination of income is reviewed under an abuse of discretion standard. *Id.* at 1077.

¶ 48 Here, the trial court imputed income to Michael after finding that he was "voluntarily unemployed" and "unwilling to pay the necessary support for his children." The court imputed

income in the amount of $17,500 per month to Michael because that was the "amount that he was living off of and using." This was an abuse of discretion.

¶ 49    The amount of income imputed to a payor spouse must be based on his earning capacity. See *Gosney*, 394 Ill. App. 3d at 1077. Here, there was no evidence presented that Michael could obtain a job earning $17,500 per month, or $210,000 per year. The only evidence presented was that Michael earned $210,000 while he was working as CFO at ISP. However, he was involuntary terminated from that position. Without any evidence that Michael could earn that amount at another job based on his qualifications, the trial court erred in imputing that income to him. See *Gosney*, 394 Ill. App. 3d at 1078; *Berger*, 88 Cal. Rptr. at 774.

¶ 50    We reverse the trial court's order imputing gross monthly income of $17,500 to Michael and remand for the trial court to determine how much income should be imputed to Michael. On remand, the court must consider the relevant factors to determine what Michael's imputed income should be based on his earning capacity, not his spending habits.

¶ 51                          III. Division of Marital Property

¶ 52    Michael argues that the trial court erred in its division of marital property. Specifically, he contends that the trial court (1) should have divided the 2013 retained earnings of ISP as a marital asset, (2) considered Coreman Technologies to be a separate entity and valued it as such, and (3) included Kathleen's payment of attorney fees as advances from the marital estate.

¶ 53                          A. Retained Earnings

¶ 54    Retained earnings are marital property. *In re Marriage of Lundahl*, 396 Ill. App. 3d 495, 504 (2009). Here, the evidence showed that ISP had no retained earnings in 2011, the year of Zouzias's valuation of ISP. However, ISP may have had retained earnings in 2013. On remand, when the parties present evidence of the value of ISP, they should also present evidence

14

regarding the existence and amount of retained earnings of ISP in any year after 2011 until the date of dissolution. If retained earnings exist, they should be divided between the parties.

¶ 55                                B. Coreman Technologies

¶ 56     It is the obligation of the parties in a dissolution proceeding to present the court with sufficient evidence of the value of the marital property. *Courtright*, 155 Ill. App. 3d at 59. The valuation of assets in a dissolution of marriage action is to be resolved by the trier of fact. *Grunsten*, 304 Ill. App. 3d at 17. A trial court may select a valuation between opposing values in evidence when the record contains conflicting evidence on valuation. *In re Marriage of Cutler*, 334 Ill. App. 3d 731, 736 (2002). However, a court's valuation cannot be based on testimony that is not supported by a proper foundation. *Id.* at 737.

¶ 57     The only evidence presented regarding the value of Coreman Technologies came from Michael, who testified that it was worth $500,000 based on its future potential. Kathleen testified that she did not know the value of Coreman. ISP's Director of Financing testified that Coreman was not a separate entity but was part of ISP and had no value outside of ISP.

¶ 58     The evidence presented at trial showed that Coreman Technologies had only two customers and gross sales of less than $5000 in three out of the four years prior to the trial. It had no existence separate from ISP, as it had no employees, no bank account, and no office, and all income attributable to Coreman was reported as ISP's income. Based on this evidence, the trial court did not err in finding that Coreman Technologies was part of ISP and included in ISP's value.

¶ 59                                C. Kathleen's Attorney Fees

¶ 60     Section 501(c-1)(2) of the Act states in pertinent part: "Unless otherwise ordered by the court ***, interim awards, as well as the aggregate of all other payments by each party to counsel

***, shall be deemed to have been advances from the parties' marital estate." 750 ILCS 5/501(c-1)(2) (West 2012). This provision creates a presumption that attorney fees will be treated as advances, but a trial court may order otherwise. *In re Marriage of Holthaus*, 387 Ill. App. 3d 367, 378 (2008). Nothing in section 501 or any other section of the Act requires a court to "equalize" attorney fees between the parties. *In re Marriage of DeLarco*, 313 Ill. App. 3d 107, 113 (2000).

¶ 61        Here, the evidence showed that Kathleen's attorney fees for the dissolution proceedings were significantly higher than Michael's. According to Michael's witness, Kathleen spent over $200,000 more than he did. Kathleen testified that she actually spent less than $80,000 more than Michael. The trial court agreed with Kathleen's testimony and found that her higher fees were at least partially incurred during the collaborative process.

¶ 62        The trial court did not err in refusing to treat Kathleen's attorney fees as advances against the marital estate. While there is a presumption under the Act that attorney fees will be treated as advances, a trial court may order otherwise, as the court did in this case. See 750 ILCS 5/501(c-1)(2) (West 2012); *Holthaus*, 387 Ill. App. 3d at 378.

¶ 63                                IV. Denial of Motion to Reopen Proofs

¶ 64        In considering a motion to reopen proofs, the trial court should take into account whether (1) there is some excuse for the failure to introduce the evidence at trial, (2) the adverse party will be surprised or unfairly prejudiced by the new evidence, and (3) there are cogent reasons to deny the motion. *In re Marriage of Suarez*, 148 Ill. App. 3d 849, 858 (1986). It may be proper to reopen proofs to allow a party to present relevant evidence that was not available at the time of trial but became known before the judgment of dissolution was entered. *Id.* at 862. A trial court does not abuse its discretion in denying a motion to reopen proofs where the evidence sought to

16

be introduced is not of utmost importance and will not materially alter the trial court's judgment. See *In re Marriage of Weinstein*, 128 Ill. App. 3d 234, 248 (1984).

¶ 65 Here, the trial ended in January 2014, and the court issued its judgment on April 16, 2014. Two months after the conclusion of the dissolution proceedings, Michael filed his motion to reopen proofs so that he could submit evidence contained in ISP's 2013 tax returns. The evidence Michael sought to introduce was not relevant, however, because a valuation of ISP had already been performed by Zouzias. The 2013 tax documents would not have assisted the court. Therefore, the court properly denied Michael's request to reopen the proofs.

¶ 66 As part of the valuation on remand, the experts and the court may consider ISP's 2013 tax returns.

¶ 67 V. Valuation of Marital Home

¶ 68 It is the responsibility of the trial court to resolve conflicting evidence concerning the valuation of marital assets. *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 663 (2008). As long as the trial court's valuation is within the range provided by the parties, it will not ordinarily be disturbed on appeal. *Id.*

¶ 69 Here, both parties submitted appraisals of the marital home. Kathleen's appraisal, performed in August 2011, stated that the value of the home was $565,000. Michael's appraisal, performed seven months later, stated that the home's value was $615,000. Michael testified that he believed the value of the home at the time of trial was $691,000, and Kathleen testified that she believed the home's value was $420,000.

¶ 70 In its order, the trial court relied on Kathleen's 2011 appraisal and found that conditions in the real estate market had improved since that appraisal was completed. As a result, the court decided that an upward adjustment from the value contained in Kathleen's appraisal was

17

appropriate. The $577,000 value that the trial court placed on the marital was within the range of valuations presented by the parties and is not against the manifest weight of the evidence. See *id.*

¶ 71                                    VI. Denying Michael's Request for Maintenance

¶ 72        Section 504(a) of the Act authorizes a trial court in dissolution proceedings to award either spouse maintenance in amounts and for periods of time as the court deems just. 750 ILCS 5/504(a) (West 2012). Section 504 sets forth the factors the court should consider when determining whether to grant maintenance:

> "(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance;
>
> (2) the needs of each party;
>
> (3) the present and future earning capacity of each party;
>
> (4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;
>
> (5) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment or is the custodian of a child making it appropriate that the custodian not seek employment;
>
> (6) the standard of living established during the marriage;
>
> (7) the duration of the marriage;
>
> (8) the age and the physical and emotional condition of both parties;

18

(9) the tax consequences of the property division upon the respective economic circumstances of the parties;

(10) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(11) any valid agreement of the parties; and

(12) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2012).

¶ 73   The purpose of maintenance is to enable a spouse who is disadvantaged through marriage to enjoy a standard of living commensurate with that during the marriage. *In re Marriage of Schuster*, 224 Ill. App. 3d 958, 970 (1992). A spouse cannot use self-imposed poverty as a basis for claiming maintenance when he has the means to earn more income. *Id.* The Act creates an affirmative duty on a spouse requesting maintenance to seek and accept appropriate employment. *Id.*

¶ 74   We will not disturb a trial court's award or denial of maintenance absent an abuse of discretion. *In re Marriage of Smith*, 2012 IL App (2d) 110522, ¶ 46. It may be an abuse of discretion to award maintenance to a spouse capable of improving his income. *Schuster*, 224 Ill. App. 3d at 970.

¶ 75   The record in this case does not support an award of maintenance to Michael. The trial court reviewed the applicable factors and found that both parties have "significant assets," "significant earning capacity," "no domestic duties," and "no time needed for education, training or employment," and that both are "young, able-bodied, and physically and mentally sound." At the time of these proceedings, Michael was 44 years of age. He was in good health and possessed a college degree. He helped create ISP and has held many positions in the company, most

19

recently serving as CFO. Michael testified that he is able to work and has already started another business of his own. He has proved capable of supporting himself without Kathleen's assistance. The trial court properly denied Michael's request for maintenance.

¶ 76                                    VII. Imposition of Trust

¶ 77        Section 503(g) of the Act provides: "[t]he court if necessary to protect and promote the best interests of the children may set aside a portion of the jointly or separately held estates of the parties in a separate fund or trust for the support, maintenance, education, physical and mental health, and general welfare of any minor, dependent or incompetent child of the parties." 750 ILCS 5/503(g) (West 2012). A need for such protection arises when the noncustodial parent is unwilling or unable to make child support payments. *Melamed*, 2016 IL App (1st) 141453, ¶ 41. We review the decision to impose a trust under section 503(g) of the Act under an abuse of discretion standard. *Id.*

¶ 78        Here, Michael responded to Kathleen's petition for child support by asserting that he was not "well able and capable of contributing to the support of the minor children." He later suggested that he pay child support based on a gross annual income of $40,000, which would require him to pay less than $1000 per month to support his children, while he was spending $17,500 per month on himself. Based on Michael's testimony, the trial court found that Michael "has not acted in good faith" and "has in fact been trying to avoid meeting his obligations to fully support the children as necessary." Because of Michael's unwillingness to pay child support, the trial court's imposition of a section 503(g) trust was not an abuse of discretion.

¶ 79                                        CONCLUSION

¶ 80        The judgment of the circuit court of Will County is affirmed in part and reversed and remanded in part.

20

¶ 81       Affirmed in part; reversed and remanded in part.

¶ 82       JUSTICE McDADE, concurring in part and dissenting in part:

¶ 83       To the extent that the majority affirms the circuit court's rulings on the issues Michael has raised on appeal, I concur with the decision. However, I believe that this appeal should be affirmed in its entirety, so I respectfully dissent from the majority's rulings on the issues relating to the barring of Michael's valuation expert and the imputation of Michael's income.

¶ 84                      I. The Barring of Michael's Valuation Expert

¶ 85       The majority's decision places the blame on Kathleen for Michael's late disclosure of Hoffer's valuation and in doing so, *assumes* that the documents Michael was requesting from Kathleen were necessary. *Supra* ¶ 35 ("the late disclosure was the result of Kathleen's failure to provide Michael and his expert with *necessary* financial information" (emphasis added)) I am unwilling to make that assumption. Zouzias's valuation of ISP was as of December 31, 2011. Michael did not attempt to compile a countering valuation for the same time period, even though he continued to serve as ISP's chief financial officer until June 2012 and presumably had unfettered access to all of the financial data until his suspension on that date. The trial court found, and the majority apparently agrees, that the December 2011 valuation was recent enough to satisfy the statute. There was nothing preventing Michael from countering *that* valuation with expert testimony.

¶ 86       Instead, he sought to develop a more contemporaneous valuation—a decision that was consistent with the version of Section 503(f) of the Illinois Marriage and Dissolution of Marriage Act in effect during the pendency of this case, which stated, in relevant part, that the circuit court, "in determining the value of the marital and non-marital property for purposes of dividing the property, shall value the property as of the date of trial or some other date as close to the date

21

of trial as is practicable." 750 ILCS 5/503(f) (West 2012). To that end, he began seeking ISP's more recent financial information.

¶ 87    When the parties began the collaborative divorce process in 2011, they hired Zouzias to perform a valuation of ISP. After the collaborative process broke down, Kathleen filed the divorce petition in February 2012. It appears from the record that Michael's former attorney requested financial information from ISP between October 2012 and into January 2013. Those disclosures were made, in redacted form, without objection from Michael. His trial attorney made additional requests for ISP's current financial information in February 2013. In April 2013, responsive disclosures were made by ISP, in redacted form. At trial, Kathleen's attorney, Paul Starkman, testified to the reason that the April 2013 disclosures had been made in redacted form.[1] While Michael's primary objection in the trial court was that these redactions precluded him from compiling a timely valuation,[2] Starkman's undisputed testimony of October 21, 2013, belied that objection:

> "The reason we were redacting, *and the only thing we redacted were the names of key customers of ISP[,]* is because we were concerned that Mr. Liszka may be about to start a competing business and had been either contacting them for that purpose or contacting them to try and interfere with the relationship with the ISP company. So we were concerned if we produced those, that kind of confidential information about

---

[1]Pinpointing the exact dates of Michael's discovery requests is challenging, as the record reflects that formal discovery requests were not made. As the circuit court noted on October 21, 2013, "[t]here is testimony and uncontroverted that all of these matters were done without subpoena and through cooperation."

[2]In essence, Michael argued in the circuit court that the redactions forced him to seek a court order requiring nonredacted documents, and that Kathleen and ISP were dilatory in responding to and complying with the court's order.

22

what clients were doing what kind of business with ISP, that might enable him to facilitate his competitive activities, if he was doing that." (Emphasis added.)

No evidence was presented to counter Starkman's testimony. Thus, contrary to the majority's analysis (*supra* ¶¶ 35-37), the redactions were not responsible for any delay in Michael producing a timely, more current valuation of ISP. In this regard, it should also be noted that Michael did not even retain Hoffer until July 10, 2013—roughly six weeks before the 60-day pretrial discovery deadline—long after he and Kathleen began the valuation process by retaining Zouzias in 2011 and long after the collaborative divorce process had broken down. Under all of these circumstances, I cannot see how Kathleen can be blamed for Michael's untimely valuation.

¶ 88       A circuit court's ruling on discovery sanctions will typically not be disturbed absent an abuse of discretion. *Locasto v. City of Chicago*, 2014 IL App (1st) 113576, ¶ 26. The majority takes Michael's argument regarding the redactions at face value—an argument that is contradicted by the record. I believe that the record supports the circuit court's October 21, 2013, finding that there was no evidence that Michael was unable to proceed with a valuation in a timely manner. Moreover, I would suggest that this issue does not warrant remand for another reason. Although Michael's expert was barred, Michael himself, who had been ISP's CFO for several years, was able to complete an assessment of the company's value and he testified, placing the higher estimated value in evidence to be considered by the trial court. There has arguably been no prejudice even if the court erred in refusing to allow the expert to testify. Accordingly, I would find that the circuit court did not abuse its discretion when it chose the sanction of barring Hoffer's testimony.

¶ 89                              II. The Imputation of Income to Michael

¶ 90       With regard to Michael's second argument, I disagree with the majority's ruling that the circuit court abused its discretion when it imputed a yearly income of $210,000 to Michael.

¶ 91       Initially, I note that the majority does not include a statement of Michael's argument in its analysis of the income imputation issue. *Supra* ¶¶ 44-50. Michael's brief on appeal actually presents a two-pronged attack on the circuit court's decision: a very short argument challenging whether any of the three situations exist under which a court can impute income and, in a different section, an alternative argument that the court erred when it imputed income in an amount based solely on Michael's stated monthly expenses of $17,500 per month. For the following reasons, I would affirm the circuit court on both prongs.

¶ 92       With respect to Michael's first prong, while the majority does state the trial court's expressed justification for imputing income, it does not actually find whether or not the decision to impute was proper. It is unclear whether that decision was also deemed an abuse of discretion or only the amount. See *supra* ¶ 48. One may assume that part of the decision is being affirmed because remand is to determine the amount (*supra* ¶ 50). However, because the majority's position is not totally clear, I address the argument raised.

¶ 93       A circuit court has the authority to impute income to a noncustodial parent if one of three situations exists: (1) he or she is voluntarily unemployed (2) he or she is attempting to evade a child support obligation or (3) he or she unreasonably failed to avail himself or herself of an employment opportunity. *Gosney*, 394 Ill. App. 3d at 1077. The circuit court's decision to impute income to a noncustodial parent is reviewed for an abuse of discretion. *Id.*

¶ 94  Here, Michael's first challenge to the income imputation fails. The circuit court found that Michael's testimony was not credible regarding his attempts to secure employment post-ISP. The court also found that Michael had been attempting to evade his child support obligation. Michael

24

has not alleged anything on this issue to show that the circuit court's findings were erroneous. Accordingly, the circuit court unquestionably had the authority to impute income for Michael. See *id.*

¶ 95    Turning to Michael's second prong, a review of Illinois case law reveals that the decision to impute income at a particular amount depends on the specific circumstances of the case. Courts have considered an individual's past income when current income was uncertain. *In re Marriage of Van Ness*, 136 Ill. App. 3d 185, 190 (1985). When past income has fluctuated, courts have averaged past income to arrive at a certain amount. *In re Marriage of Garrett*, 336 Ill. App. 3d 1018, 1025 (2003). Courts have also considered, *inter alia*, an individual's education (*In re Marriage of Evanoff*, 2016 IL App (1st) 150017, ¶ 26 (involving the imputation of income for maintenance purposes)); an individual's skills and experience (*In re Marriage of Sweet*, 316 Ill. App. 3d 101, 107 (2000)); the income of a new spouse (*In re Parentage of M.M.*, 2015 IL App (2d) 140772, ¶ 42 (involving the imputation of income for the purpose of contributing toward educational expenses)); and whether an individual's financial circumstances had changed (*In re Marriage of Pasquesi*, 2015 IL App (1st) 133926, ¶ 30 (affirming a circuit court's ruling that upheld the status quo of paying child support at an income level of $60,000 when, even though the individual was still operating at a loss, his circumstances had actually improved because his losses had decreased now that he was self-employed)).

¶ 96    In this case, unlike the majority, I would find that Michael's alternative argument also fails. A review of the transcript from the circuit court's ruling on December 2, 2014, reveals that the court did not impute income to Michael based solely on his monthly expenses. In pertinent part, the court stated:

"During the hearing the Court heard various testimony again of the witnesses indicating that during the marriage the respondent, Mr. Liszka, *had been the chief financial officer and chief executive officer of the marital business*, ISP Painting, Inc., which was established again during the marriage created by both parties. At the time of this hearing it appears it was unrebutted that the respondent is still owner, part owner of ISP Painting. During the time that he worked for ISP *he was in charge of the H-R department, accounting and marketing. He worked there for over 20 years.*

And as far as his educational background, he has a *Bachelor's in science and financing*. He was placed on administrative leave in June of 2012 due to official misconduct and was during his period of administrative leave did in fact receive full compensation. He was paid *his regularly salaried compensation of approximately $210,000.00 per year*. That he received until the end of April 2014. Sometime again in June of 2014 he was officially terminated from ISP Painting.

At the time that the Court issued its decision in April of 2014 the judgment for dissolution of marriage was entered. It was contemplated that the respondent would require some time in which to become self-employed or obtain new employment, that he was given the six months additional time to do that.

The evidence was clear that the respondent as of the date of—of the first date of the hearing, September 4, was still unemployed—well, actually strike that. He was not working for any third party. According to *his testimony he was in the process of trying to incorporate and start his own business, a new painting business, and the Court found his testimony to be incredible.*

He indicated that he had been spending months researching products, looking into incorporation, getting things set up. He indicated some difficulty in trying to incorporate, some problems with the name of the business all of which I found incredible based upon my own experience and knowledge of the Secretary of State incorporating the business. You can do that literally in one hour on line. That is not a month to month or two year process. *It was clear from Mr. Liszka's testimony that he firmly believes that the best use of his skills and time is to be an entrepreneur, and certainly if that's what he wishes to pursue, he can pursue that understanding that he still has under the law an obligation, a continuing present obligation to support his children.*

\* \* \*

In his verified response to Ms. Liszka's motion to set support and requesting a job search, *he specifically denied the allegation that he was well able and capable of continuing or, I'm sorry, contributing to the support of the children.* Then on his first day of testimony he again *testified here in court to this Court that he was not able or capable of contributing to the support of the children to the full extent.*

Later on one of the subsequent days of the hearing he *testified he was willing to pay child support but willing to pay based upon his very recent salary of $40,000.00.* Again on the first day of hearing there was no salary set. He had no income coming in other than the income that he received through cashing in his 401K and other savings that *he was using to maintain his standard of living which the Court finds was high.*

*After the judgment was entered he was still maintaining a rather high standard of living spending over $17,000.00 a month* in living expenses, 10,500 of which was just

27

in his living expenses, mortgage, rents, miscellaneous expenses, children's expenses, credit cards and then $7,000 additional for attorney's fees.

At no time did I hear any evidence or see, hear any testimony to indicate that Mr. Liszka had done anything to further his education, so apparently he's satisfied with his Bachelor's. *Given the 20 years experience that he has and the various things that he testified to, he had marketing and accounting, chief financial officer, chief executive officer, I believe that his skills said that he is very competent, is one in which he could have been able to find new employment at any time during the two and a half years that he was on administrative leave.*

Again I appreciate Mr. Liszka's claim that during that two and a half years that he was on administrative leave he did not believe or at least *he testified that he did not believe that he was free to work for another painting company because he felt that would be a breach of his fiduciary duty* as owner of ISP Painting, however, again the evidence does not support that claim. The exhibit that was admitted that showed clearly when he was put on notice he was on administrative leave, *he was specifically exempted from being barred from contacting potential competitors for this express purpose of seeking new employment. He chose not to do that. He chose apparently—again he just—he chose not to do any type of job search that I heard or am finding from this hearing.*

After the judgment was entered, and again *he had the six months from January*, he wants the Court to believe that it was reasonable and credible that it took him *six months more* than that because he didn't have apparently his business incorporated until October 14 when he presented the corporate minutes, the initial minutes from his

28

new company showing his as the sole president, the sole director, secretary and president of the new company, that it took him almost three years to get that company set up. And that *I find again incredible given again he was very firm in his belief that the best use of his time was to be an entrepreneur, and so I can't believe that as an entrepreneur during the two and a half years he would have sat idle and not been staying current on products and all the necessary things needed to start the new business. He should have had his business plan and everything all lined up and ready to go so that once that judgment was entered, he could have immediately hit the ground running*. Again that's giving him the best benefit—giving him the benefit of the doubt.

\* \* \*

I find that the *respondent is voluntarily unemployed*, that he is in fact unwilling to pay the necessary support for his children, and I am going to impute income to him in the amount of $17,500.00 per month which is the amount that he was living off of and using." (Emphases added.)

¶ 97 The majority, erroneously in my opinion, reads the court's statement that "I am going to impute income to him in the amount of $17,500.00 per month which is the amount that he was living off of and using" in isolation. The court did *not* base its imputation solely on Michael's stated monthly expenses. When the court's statement is placed in its proper context, it is absolutely clear that in this long and complicated case, the court carefully considered all of the evidence presented. It specifically addressed Michael's degrees in finance and business, his education, his entrepreneurial ability, his substantial and long-term professional experience in several different high-level capacities (including stints as CEO, as CFO, and in human resources

29

and accounting) and the salary he was making at ISP, in addition to his claimed monthly expenses. As is evident from the cases cited above, these are factors that have been used by Illinois courts to determine the appropriate amount of income to impute. As shown in its oral ruling, the court did precisely what the majority has indicated above that it should do (*supra* ¶ 45). If a party is not making a good-faith effort to earn sufficient income (as the court found Michael was not), the court may set a support obligation at a level higher than the parent's actual income as long as the award is appropriate based on the party's skills and experience. *Sweet*, 316 Ill. App. 3d at 107. Also noteworthy here is the majority's citation to *Gosney*[3] for the proposition that, "[i]t is well established that courts have the authority to compel parties to pay child support at a level commensurate with their earning *potential*." (Emphasis added.) *Gosney*, 394 Ill. App. 3d at 1077. The court's oral ruling plainly, in my opinion, demonstrates compliance with these strictures.

¶ 98        The majority's additional requirement that there be opportunities for Michael to earn that wage in his geographic area appears to be derived solely from cases decided in New Jersey (*Caplan*, 864 A.2d at 1117) and Nebraska (*Claborn*, 673 N.W.2d at 540). *Supra* ¶ 45. Similarly, only a California decision (*Berger*, 88 Cal. Rptr. At 774) is cited as authority for foreclosing evidence that Michael once made $210,000, and presumably could again, as a sufficient basis for imputing income. *Supra* ¶ 47. No Illinois law is cited for these propositions. However, even if those cases are reflective of Illinois law, the entrepreneurial nature of the enterprise that provided

---

[3]I note separately that *Gosney* did not actually reach the challenge to the amount of income imputed to an individual. Rather, in *Gosney*, this court held that the circuit court abused its discretion, not because the imputed amount was incorrect but because none of the three situations in which a court has authority to impute income existed. *Gosney*, 394 Ill. App. 3d at 1077-78. *Gosney* did not address the situation the instant case presents, namely, that at least one of the three situations existed such that the circuit court in fact had the authority to impute income and that the actual amount the court set is at issue. Thus, I question the propriety of the majority's use of *Gosney* as stated in paragraphs 47 and 49, *supra*.

Michael's prior salary and the fact that he is attempting to set himself up once again in another, similar entrepreneurial painting business would seem to render such requirements and restrictions inapplicable to him. Quite simply, this record contains nothing to support a finding, based on Illinois law, that the circuit court abused its discretion when it imputed a yearly income of $210,000 to Michael, and I believe the majority's ruling to the contrary is incorrect.

¶ 99 By way of postscript, I am also troubled by the majority's statement that, "[w]ithout any *evidence* that Michael could earn that amount [$210,000] at another job based on his qualifications, the trial court erred in imputing that income to him." *Supra* ¶ 49. Where does that evidence come from? Michael had earned that salary as the chief financial officer and as the chief executive officer of a private corporation valued at over $1 million. How could Kathleen obtain that type of private salary information from other private corporations? And, if Michael had access to such information, what would be his incentive to provide it to the court? While evidence regarding the salary one could make at a similar job for another company is relevant, and even necessary, in some cases, it is not *necessary* to the circuit court's income imputation decision in the instant case. Michael is in the process of recreating the enterprise that he has demonstrated he had the education, vision, and business acumen to develop, along with the experience and additional skills to maintain and to command an annual salary of $210,000. It is neither unreasonable nor an abuse of discretion for the trial court to impute to him the ability to generate a similar income in such an enterprise.

¶ 100 Lastly, I note that, in remanding this matter to the circuit court, the majority does not instruct the court to reconsider the entirety of the marital property distribution. The new valuation of ISP would surely impact the overall value and equitable distribution of the marital estate.

31

¶ 101     For the foregoing reasons, I respectfully dissent from the majority's rulings reversing the circuit court's order barring the testimony of Michael's valuation expert and imputing Michael's income, and I concur in the affirmance of the other issues raised by Michael in this appeal.