# Illinois Official Reports

## Appellate Court

---

### *In re Marriage of Van Hoveln*, 2018 IL App (4th) 180112

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF KYRIA J. VAN HOVELN, Petitioner-Appellee, and BRENTON F. VAN HOVELN, Respondent-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-18-0112 |
| Filed | November 16, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Woodford County, No. 12-D-87; the Hon. Charles M. Feeney III, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Gina L. Wood, of Thomson & Weintraub, LLC, of Bloomington, for appellant.<br><br>David H. McCarthy, of McCarthy Law Firm, of Peoria, for appellee. |
| Panel | JUSTICE DeARMOND delivered the judgment of the court, with opinion.<br>Justices Steigmann and Knecht concurred in the judgment and opinion. |

**OPINION**

¶ 1     In September 2014, the trial court entered a judgment of dissolution of marriage between petitioner, Kyria J. Van Hoveln, and respondent, Brenton F. Van Hoveln. In January 2018, the court ordered Brenton to pay $356.33 per week in retroactive maintenance for 207 weeks, totaling $73,760.31.

¶ 2     On appeal, Brenton argues the trial court erred in (1) awarding retroactive maintenance to Kyria and (2) imputing income to Brenton for a time frame subsequent to the termination of his employment. We reverse.

## I. BACKGROUND

¶ 3

¶ 4     In September 1993, Kyria and Brenton were married in Watseka, Illinois. Two children were born during the marriage. In August 2012, Kyria filed a petition for dissolution of marriage. At that time, Kyria was 49 years old and employed at Illinois Wesleyan University. Brenton was 42 years old and employed as a Bloomington police officer. In her petition, Kyria asked that Brenton pay a reasonable amount in child support and maintenance.

¶ 5     In April 2013, Kyria filed a petition for temporary relief, asking the trial court to order Brenton to pay a reasonable amount in child support and maintenance. Kyria stated Brenton was "making substantial income" as a police officer. In its June 2013 temporary order, the court granted Kyria exclusive possession of the marital residence, ordered Brenton to pay $469 biweekly for child support, required Brenton to maintain health insurance for Kyria and the children, and reserved the issue of maintenance. The court granted Brenton temporary custody of the youngest child in February 2014.

¶ 6     Brenton filed a petition to modify the temporary order regarding his health-insurance obligation in June 2014. Brenton claimed he had been terminated from his employment as a police officer and lost his benefits, including his ability to provide insurance for himself and the children. Brenton asked that Kyria be required to provide health insurance for him and the children.

¶ 7     In September 2014, the trial court entered the judgment of dissolution of marriage. On the issues concerning child custody, visitation and support, maintenance, and the division of marital and nonmarital property, the court reserved the matter for further negotiation and judicial determination.

¶ 8     In February 2017, the parties entered into a marital settlement agreement, which addressed real estate, vehicles, bank accounts, personal property, retirement accounts, and other assets and liabilities. The agreement indicated the "issue of maintenance remains reserved for further negotiation or judicial determination." The trial court entered an order memorializing the distribution of various assets.

¶ 9     The parties presented evidence on the maintenance issue and submitted a bystander's report in lieu of a verbatim transcript. Kyria testified she has a high school education with "a couple years" of college. She began her employment at Illinois Wesleyan University in 2006 and earned the following wages: $31,612 (2013), $30,483 (2014), $31,379 (2015), and $17,368 (2016). She continued to reside in the marital residence until August 2016 and made the mortgage payments by utilizing all of her savings and incurring credit card debt. In August 2016, she voluntarily left her employment with Illinois Wesleyan University and began

residing with her boyfriend on a continuing conjugal basis. At some point, she became employed by Country Chevrolet.

¶ 10 Brenton testified he was employed as a Bloomington police officer from August 1985 until May 2014 and earned the following wages: $72,000 (2012), $95,930 (2013), and $42,017 (January 1, 2014, to May 14, 2014). On May 14, 2014, Brenton lost his job at the police department due to his misconduct, including violating the direction of his superiors and police department policy with which he disagreed. Brenton appealed the termination through a grievance procedure, but the appeal was denied. Thereafter, Brenton received unemployment income of $15,096 for 2014.

¶ 11 In 2014, Brenton started his own tree removal and trimming business. For the year, he had gross income of $9866 and expenses of $19,051. Also in 2014, his income tax return showed a farming loss of $5492 and a farm rental loss of $14,200. In 2015, Brenton's business earned gross income of $85,967 and had expenses totaling $71,225. His 2015 tax return showed a farming loss of $1621 and a farm rental loss of $8760.

¶ 12 In his September 2015 financial affidavit, Brenton stated he earned $6875 per month, including $6500 from his business and $375 from the farm rental. He stated the affidavit was prepared during a busy time of the year and, therefore, his income was higher than other times of the year. In 2016, the business had a net profit of $38,705, and his income tax return showed total income totaling $28,032. He also incurred a farming loss of $4345 and a farm rental loss of $3527.

¶ 13 The bystander's report stated Kyria worked full-time, cooked, cleaned the house, cared for the children, and helped with the yard during the marriage. Brenton worked full-time, worked in the yard, took care of deer raised on the farm, and was involved in the children's activities.

¶ 14 Kyria argued maintenance was appropriate due to the length of the marriage, the income disparity between the parties during the marriage, the initial request for maintenance, and the circumstances surrounding the termination of Brenton's employment.

¶ 15 Brenton argued Kyria never set a hearing for her request for temporary maintenance during the dissolution proceeding and failed to provide evidence showing she had a need for temporary maintenance. Brenton argued the fact she chose not to work during the summers, along with her agreement to be responsible for her own debts and liabilities in the dissolution without assistance, was evidence she did not need temporary maintenance. Brenton also argued he "was terminated through no fault of his own, applied for and obtained unemployment benefits and, because temporary maintenance was never ordered, did not have an opportunity to seek modification [of] any such obligation."

¶ 16 In January 2018, the trial court entered an order on the issue of maintenance. The court noted Kyria sought maintenance for the time period of August 2012 until August 2016, the latter date when she began residing "with another on a continuing conjugal basis." In analyzing the appropriateness of a maintenance award, the court considered the prior and current versions of section 504(a) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/504(a) (West 2016)). In looking at the income and property of each party, the court found this factor favored an award of maintenance because Brenton "always earned substantially more than" Kyria. The court noted Kyria's "lack of summer employment at least at times during the marriage provided a benefit to the marital estate."

¶ 17    Kyria asked the trial court to impute Brenton's income as a police officer for the period of time after which he lost his position, given the basis for which he lost his job. The court found it "difficult to understand why [Brenton] chose to purposefully disregard the lawful directives of his department as a result of his personal beliefs in what was appropriate," and it was "made even more difficult when his actions included dishonesty in writing traffic tickets." The court found Brenton's income after May 14, 2014, "speaks for itself," and "[i]f the family unit had been intact on that date, the family unit would have suffered the consequences of the loss of employment and [Kyria] would not have had any ability to recoup the loss to the family." The court also stated as follows:

> "At the time [Brenton] chose to act inconsistently with police department policy, he was on notice that his marriage was undergoing dissolution and that his spouse was seeking maintenance. He therefore understood that he had potential support obligations to his spouse. He was not free to disregard those support obligations to pursue his own ideas of fairness in carrying out his duties as a police officer. In taking his actions, he not only placed his own livelihood at risk but, without the consent of [Kyria], he also placed her livelihood at risk."

¶ 18    The trial court found Brenton did not voluntarily quit his job as a police officer, as he made genuine attempts to keep his position and he was not attempting to evade a potential support obligation. However, the court found Brenton "did unreasonably fail to take advantage of an employment opportunity," as his actions in violating department policy and in being dishonest were "wholly unreasonable."

> "[Brenton] had a clear continuing employment opportunity from which he earned a substantial income and would continue to earn a substantial income even if his income declined to the 2012 level. In order to realize this continuing opportunity, [Brenton] merely had to follow the lawful directives of his superiors and to otherwise conduct himself in accordance with the law. To not take such ordinary and basic actions is certainly unreasonable. As such the imputation of income is appropriate. Income at that level in comparison with [Kyria's] income throughout the marriage supports an award of maintenance."

¶ 19    The trial court found several factors irrelevant or insignificant. In considering the factor as to the time necessary to enable Kyria to acquire appropriate education, training, and employment and whether Kyria was able to support herself through appropriate employment, the court noted Kyria benefited during the marriage from Brenton's support in paying for her needs. During the time period she sought maintenance, Kyria was able to pay her bills and meet her needs but only by exhausting her savings and incurring credit card debt. As this was inconsistent with the standard of living during the marriage, the court found this factor favored an award of maintenance.

¶ 20    In considering the factor related to the parties' standard of living during the marriage, the trial court found their standard of living "was not lavish" and both parties had employment. The court found "the standard of living of the parties did include developing *** savings, paying their bills and not incurring a great deal of debt" and, during the relevant time period, "this particular aspect of the parties' standard of living diminished for [Kyria]."

¶ 21    The trial court found the marriage was of "significant duration" and "of such length that each party to the marriage ought to reasonably believe that they owe an obligation to their

partner for their care and support." The court also found "[b]oth parties are of sound mind and body" and the tax consequences were not significant in the maintenance determination.

¶ 22 In analyzing the current version of the Dissolution Act, the trial court considered the financial obligations imposed on the parties as a result of the dissolution. The court noted the marital settlement agreement required each party to be responsible for their own liabilities. When considering Kyria's obligation to pay her credit card debt incurred to meet her needs and without a supporting contribution from Brenton, the court found it would allow Brenton "to avoid his obligation to maintain his spouse of many years in a manner consistent with the standard of living established during the marriage."

¶ 23 The current version of the statute also requires the trial court to consider "any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought." 750 ILCS 5/504(a)(5) (West 2016). The court noted, during the relevant time frame, Brenton did suffer a loss of employment. While it was possible that Brenton's "choices that resulted in this loss of employment may impact his ability to regain employment as a police officer," the court stated "he did not otherwise suffer any impairment to his earning capacity." The court did not find any impairment of Brenton's earning capacity during the relevant time that would diminish his maintenance responsibilities.

¶ 24 After considering the relevant factors, the trial court found maintenance was appropriate for the time period in question. The court calculated the average of Brenton's weekly gross income from 2012 through 2014 was $1808.23 and Kyria's weekly gross income from 2012 through 2016 was $611.61. Under the guidelines of section 504, the court ordered Brenton to pay Kyria $356.33 per week for the time period of August 10, 2012, to August 1, 2016. With 207 weeks during the relevant time period, the court calculated the total owed by Brenton to be $73,760.31. The court entered judgment in favor of Kyria and against Brenton. This appeal followed.

¶ 25 **II. ANALYSIS**

¶ 26 Brenton argues the trial court abused its discretion by awarding retroactive maintenance under the Dissolution Act. We agree.

¶ 27 Section 504(a) of the Dissolution Act (750 ILCS 5/504(a) (West 2016)) provides that in a dissolution proceeding, the trial court "may grant" maintenance in an amount and for a period of time "as the court deems just." When considering whether a maintenance award is appropriate, section 504(a) sets forth 14 factors for the trial court to consider, including:

"(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment or any parental responsibility arrangements and its effect on the party seeking employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences of the property division upon the respective economic circumstances of the parties;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2016).

¶ 28    When determining whether a maintenance award is appropriate, the trial court shall state its reasoning and make specific findings of fact referencing each relevant factor from section 504(a). 750 ILCS 5/504(b-2)(1) (West 2016). No one factor is dispositive as to whether the court should award maintenance. *In re Marriage of Harlow*, 251 Ill. App. 3d 152, 157, 621 N.E.2d 929, 934 (1993). If the court concludes maintenance is appropriate, the court shall then determine the duration and amount of maintenance according to section 504(b-1) of the Dissolution Act. 750 ILCS 5/504(b-1) (West 2016).

¶ 29    Both the amount and duration of a maintenance award lie within the sound discretion of the trial court. *In re Marriage of Donovan*, 361 Ill. App. 3d 1059, 1062, 838 N.E.2d 310, 314 (2005). We will not reverse a trial court's maintenance award on appeal absent an abuse of discretion. *In re Marriage of Culp*, 341 Ill. App. 3d 390, 394, 792 N.E.2d 452, 456 (2003).

¶ 30    Under section 504 of the Dissolution Act (750 ILCS 5/504 (West 2016)), there are four common types of maintenance: permanent maintenance, rehabilitative maintenance for a fixed term, rehabilitative maintenance with a review date, and maintenance in gross. *In re Marriage of Shen*, 2015 IL App (1st) 130733, ¶ 84, 35 N.E.3d 1178. The distinguishing characteristic of maintenance in gross from the other forms of maintenance is the definite amount and vesting date. *Shen*, 2015 IL App (1st) 130733, ¶ 86. Rehabilitative maintenance is intended to assist and encourage dependent spouses to become financially independent. *In re Marriage of Henzler*, 134 Ill. App. 3d 318, 322, 480 N.E.2d 147, 149 (1985). We noted in *Henzler* it was inherent in the concept of rehabilitative maintenance that the recipient was "under an affirmative obligation to seek appropriate training and skills to become financially independent in the future." *Henzler*, 134 Ill. App. 3d at 322. Permanent maintenance, however, is "appropriate where it is evident that the recipient spouse is either unemployable or employable only at an income that is substantially lower than the previous standard of living." *In re Marriage of Micheli*, 2014 IL App (2d) 121245, ¶ 18, 15 N.E.3d 512. Maintenance in gross is a form of maintenance that is "a nonmodifiable sum certain to be received by the former spouse regardless of changes in circumstances," which includes remarriage or

cohabitation. *In re Marriage of Freeman*, 106 Ill. 2d 290, 298, 478 N.E.2d 326, 329 (1985). In addition, periodic maintenance, typically a specified amount payable over a period of time in regular intervals, is the preferred form of maintenance, except under " 'exceptional circumstances.' " *In re Marriage of Bohnsack*, 2012 IL App (2d) 110250, ¶ 10, 968 N.E.2d 692 (quoting *Lamp v. Lamp*, 81 Ill. 2d 364, 374, 410 N.E.2d 31, 35 (1980)).

¶ 31　　In the case *sub judice*, the trial court never specified the nature of maintenance it was awarding, nor did Kyria identify the form of maintenance being sought. During the course of the proceedings, she did not seek a hearing on temporary maintenance, which could have been decided summarily by the court based on affidavits and exhibits (750 ILCS 5/501 (West 2016)). In addition, neither party claims the award was temporary maintenance, which, by its very nature, would not be appealable. See *In re Marriage of Dunseth*, 260 Ill. App. 3d 816, 827, 633 N.E.2d 82, 91-92 (1994).

¶ 32　　At the outset of the proceedings, Kyria was already gainfully employed, albeit at a salary substantially lower than that of Brenton before he was involuntarily terminated from his position with the Bloomington Police Department. When she filed her petition for dissolution in August 2012, she sought custody of the children, child support, and unspecified maintenance. Her April 2013 petition for temporary relief alleged the children lived with her and, as a result, she should be awarded exclusive possession of the marital residence, along with a reasonable amount for child support and maintenance. Pursuant to a June 2013 order, she was awarded the marital residence and $469 biweekly for children support, with maintenance having been reserved. By the time an agreed temporary order was entered at the end of February 2014, one child had attained the age of 18 and, according to Brenton in previous pleadings, expressed a desire to live with him. Also, the younger child (16 years old) had already moved in with Brenton, and temporary child support was terminated. Again, maintenance was reserved. Throughout the more than five years this case was pending, the issue of maintenance was reserved repeatedly.

¶ 33　　By the time of the final hearing, which addressed only maintenance, there were no pleadings filed seeking retroactive maintenance, and it appears from the bystander's report there was no mention of retroactive maintenance by the parties. Instead, according to the evidence, without any discussion of the possibility of retroactive maintenance being sought by Kyria or awarded by the trial court, the parties divided all marital assets by agreement or pursuant to the court's findings, including the marital residence, real-estate holdings, and an "equalization payment" to Kyria of $41,568.90 "in order to equalize the distribution of real property." The parties also disposed of livestock, for which Brenton had been solely responsible since initiation of these proceedings, with the proceeds to be divided evenly.

¶ 34　　In addition, there had been a substantial change in the circumstances of both parties from the time the petition was filed. Brenton had been terminated from a long-term position with the police department, where he was months away from being eligible for a full pension. According to the arbitrator's award letter denying his grievance for discharge, Brenton was an 18½-year veteran of the department and was four months from eligibility for a full pension. According to the bystander's report and the trial court's January 24, 2018, order, Brenton was employed from August 20, 1985, to May 14, 2014, which would make him a 29½-year veteran of the department. At oral argument, counsel indicated Brenton had worked at the department for approximately 18 or 19 years. Brenton's income went from a high of $95,930 in 2013, with an unspecified amount of overtime, to a 2016 total income of $28,032 from his tree removal

and trimming business. In 2014, he earned $42,017 from January until his termination in May, along with $15,096 in unemployment compensation for the rest of the year. For the rest of 2014 and 2015, he recorded net losses for the new business.

¶ 35 Kyria, on the other hand, had been gainfully employed at Illinois Wesleyan University in Bloomington since 2006 where, for the three years prior to August 2016, she earned an average of $31,157. In August 2016, she voluntarily quit her job to move in with her new boyfriend. During the marriage, she did not work over the summer months and that continued during the pendency of these proceedings as well. More importantly, at no time during the 27 different hearings where maintenance continued to be reserved did Kyria assert a need for financial assistance pending the outcome. Thus, the award would not be considered temporary maintenance intended to assist her with her finances during the life of the case.

¶ 36 At the final hearing in December 2017, Kyria sought maintenance from August 2012 to August 2016. It appears the parties agreed she could no long receive maintenance thereafter due to her cohabitation, since that was raised by Kyria's own counsel. This is significant to our analysis since it would therefore appear neither the parties nor the court were considering the requested payments to be "maintenance in gross." See *Freeman*, 106 Ill. 2d at 299.

¶ 37 The bystander's report stated Kyria "did not present any evidence showing that she incurred debt during this time [the period for which maintenance was sought] or that bills were unpaid. When pressed, she made a general claim that she incurred credit card debt that she has since paid off." Earlier in the report, it indicates she said she utilized all her savings and incurred credit card debt "in order to meet her needs." However, she was not pressed and did not offer any specific amounts or documentation to support her claim. The problem with her assertion is that it is not supported by the record. None of her financial affidavits reflect a drastic change in any reported savings accounts and her credit card debt remains a constant $150 per month throughout. It would thus appear the trial court accepted Kyria's unsubstantiated representation that she "utilized all her savings and incurred credit card debt" to pay her regular needs and expenses as part of its rationale for awarding maintenance.

¶ 38 The award cannot be considered rehabilitative maintenance either since Kyria was gainfully employed and voluntarily chose to terminate that employment to cohabit with her boyfriend. Kyria did not claim a need for financial assistance to obtain some sort of employable skill, and according to all the evidence before the trial court at the time maintenance was sought, she was already financially independent. She could afford to pay all her bills, had no outstanding debts unpaid, and was apparently able to quit her job of 10 years. Her W-2 form from Country Chevrolet in Bourbonnais, Illinois, where she began working after moving to live with her boyfriend, showed a gross income of $19,380 for tax year 2016, which would be reflective of the five months from August through December. According to the order, Kyria's gross income for the first half of 2016 was $17,368 from Illinois Wesleyan University, so she was not only gainfully employed but her earnings now exceeded what she made during the marriage.

¶ 39 The trial court's analysis included the necessary consideration of the factors listed in both the previous and current version of section 504(a). When considering the first factor, "the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance" (750 ILCS 5/504(a)(1) (West 2016)), the court imputed as income to Brenton his pretermination income as a police officer, although by the time of the hearing, he was earning even less than Kyria.

¶ 40    "For the purpose of imputing income, a court must find one of the following: (1) the payor has become voluntarily unemployed, (2) the payor is attempting to evade a support obligation, or (3) the payor has unreasonably failed to take advantage of an employment opportunity." *In re Marriage of Blume*, 2016 IL App (3d) 140276, ¶ 30, 59 N.E.3d 135. "The amount of income imputed by the court must be supported by evidence showing that it is commensurate with the supporting parent's skills and experience." *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 46, 77 N.E.3d 1000. "When calculating the amount of income to impute, the trial court may consider the supporting parent's income from previous employment. [Citations.] However, a court should not base its income calculation on outdated data that no longer reflect prospective income." *Liszka*, 2016 IL App (3d) 150238, ¶ 47.

¶ 41    Citing *In re Marriage of Ruvola*, 2017 IL App (2d) 160737, 83 N.E.2d 19, and *Blume*, 2016 IL App (3d) 140276, the trial court concluded Brenton did not meet either of the first two bases for imputing income, *i.e.*, voluntary unemployment or attempting to evade a support obligation, but he did meet the third—unreasonably failing to take advantage of an employment opportunity.

¶ 42    *Ruvola* involved a degreed chemist, who once earned $125,000 per year but was sporadically employed at everything from a part-time tennis professional to a salad maker at a pizzeria by the time he petitioned for divorce. *Ruvola*, 2017 IL App (2d) 160737, ¶¶ 25, 35. The court ultimately imputed income to him as part of his request for maintenance from the respondent, finding he was voluntarily underemployed. *Ruvola*, 2017 IL App (2d) 160737, ¶ 38. This is the reverse of the situation before us. In *Blume*, 2016 IL App (3d) 140276, ¶ 31, a farmer was found to have voluntarily discontinued farming in light of the divorce to evade his support obligation. No one contended, nor did the trial court find in this case, Brenton voluntarily terminated his employment. Although the court acknowledged Brenton "made genuine efforts to try to keep his position in appealing the termination," it found Brenton's "actions reflect his disagreement with the policies of the police department and without regard to the financial wellbeing of himself or his spouse."

¶ 43    A trial court's decision whether to impute income is reviewable under the abuse of discretion standard. See *In re Marriage of Lichtenauer*, 408 Ill. App. 3d 1075, 1091, 945 N.E.2d 119, 132 (2011). In *In re Marriage of Gosney*, 394 Ill. App. 3d 1073, 1078, 916 N.E.2d 614, 619 (2009), the trial court found the petitioner was involuntarily unemployed when the evidence revealed he had been forced out as partner of an investment management company when he refused to agree to "unfair and oppressive negotiation tactics" in which the other partners engaged as part of a proposed buyout. The petitioner was then asked to leave the firm and terminated. *Gosney*, 394 Ill. App. 3d at 1078. Although *Gosney* involved imputing income for child support purposes, the analysis of the three factors mentioned above are the same. The Third District found the imputation of income to the petitioner was an abuse of discretion since he, like Brenton here, did not meet either of the first two factors and was involuntarily unemployed. *Gosney*, 394 Ill. App. 3d at 1077-78. When he disagreed with what he considered "unfair and oppressive negotiation tactics," he was forced out. *Gosney*, 394 Ill. App. 3d at 1078.

¶ 44    Here, Brenton disagreed with an apparent departmental policy regarding the mandatory issuance of traffic tickets for vehicle accidents and equated it to being required to maintain a "quota." He disagreed with the principle and refused to comply, resulting in a reprimand and his ultimate termination. The fact that Brenton was less than four months away from his

eligibility for a full pension would tend to indicate how strongly he disagreed with the practice and not that he was intending to lose his job. In *Liszka*, 2016 IL App (3d) 150238, ¶ 47, the appellate court cited *Gosney* as support for finding "[a] trial court may not impute income in the amount of an obligor's prior income where the obligor has been involuntarily terminated from his prior employment and there is no evidence that a job with the same salary is available to him." The court found an abuse of discretion when, after involuntary termination, there was no evidence the payor had similar employment available to him or could earn similar amounts at another job based on his qualifications. *Liszka*, 2016 IL App (3d) 150238, ¶ 49. "Evidence that the obligor once earned a certain salary and presumably could again is an insufficient basis upon which to impute income." *Liszka*, 2016 IL App (3d) 150238, ¶ 47.

¶ 45        Here, no evidence was presented to indicate Brenton had similar law enforcement jobs available to him or that he had any likelihood of being so employed after having been terminated from the police department. Further, we find the third factor—unreasonably failing to take advantage of an employment opportunity—applies to circumstances arising after the loss of the employment from which the trial court seeks to impute income. Otherwise, there is no distinction between the first and third factors. The court here concluded Brenton unreasonably failed to take advantage of an employment opportunity by failing to retain his previous employment. *Gosney*, *Liszka*, and even the cases cited by the court all involved the loss of employment as a condition precedent to assessing whether the payor was failing to take advantage of *future* employment opportunities. Having concluded he was neither voluntarily unemployed nor attempting to evade payment of maintenance, it was an abuse of discretion for the court to conclude Brenton's involuntary discharge from the police department during the pendency of the divorce constituted an unreasonable failure to take advantage of an employment opportunity as that factor is intended. As a result, the court's factual findings imputing income as a police officer for any period of time after Brenton's termination was against the manifest weight of the evidence.

¶ 46        Compounding the error in imputing income, the trial court awarded maintenance well after the parties entered into the marital settlement agreement. In *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 660, 895 N.E.2d 1025, 1045 (2008), the First District noted a retroactive temporary maintenance "award should have been funded from the marital estate prior to the property division, rather than from [the respondent's] postdivision share." In discussing maintenance and the distribution of marital property, the Third District stated as follows:

> "[T]he issue of maintenance is interrelated with the distribution of the marital property [citation]. While recognizing that maintenance and distribution of property are considered together, they are clearly not the same thing. Maintenance is a sum of money payable to a spouse for his or her support. It is not the same thing as a distribution of property. We have found no case that stands for the proposition that maintenance can be used to pay a portion of the marital debt. In fixing a maintenance award, the court should consider the amount of property that it is distributing to each party. Nonetheless, maintenance and property distribution are two separate concepts which cannot be interchanged as the trial court has done here. [Citations.] While the award may have been proper had it been characterized strictly as a property settlement, we find that it was not proper as maintenance where the record shows that the wife's financial condition did not warrant any maintenance." *In re Marriage of Lees*, 224 Ill. App. 3d 691, 694-95, 587 N.E.2d 17, 20 (1992).

¶ 47    Here, the evidence failed to indicate Kyria was entitled to any of the common forms of maintenance for the period of time for which it was awarded. Instead, the trial court's award of maintenance amounted to a redistribution of property after the parties had already agreed to the distribution of marital property. This was improper and must be reversed.

¶ 48                                    III. CONCLUSION
¶ 49    For the reasons stated, we reverse the trial court's judgment.

¶ 50    Reversed.