**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220526-U

Order filed November 30, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| PHYLLIS BONZANI, n/k/a PHYLLIS | ) | Will County, Illinois, |
| SPORLEIN, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-22-0526 |
| | ) | Circuit No. 10-D-1062 |
| and | ) | |
| | ) | |
| ROBERT ANTHONY BONZANI, | ) | Honorable |
| | ) | Dinah Archambeault, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Justices Peterson and Albrecht concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  The trial court erred in limiting its maintenance review to duration when it should have also reviewed amount. It did not, however, abuse its discretion in extending maintenance indefinitely. Reversed in part and affirmed in part.

¶ 2    Robert Bonzani appeals from a postdissolution order extending a $3000-per-month maintenance award indefinitely in favor of his ex-wife, Phyllis Sporlein. He argues the court improperly limited its review of the original maintenance award to duration when it should have

also considered amount. He also argues the court erred in extending the award indefinitely and failed to consider Phyllis's efforts to become financially independent. For the reasons that follow, we reverse in part and affirm in part.

¶ 3                                   I. BACKGROUND

¶ 4        The parties were married in April 1993 and divorced in June 2012. The dissolution judgment incorporated a marital settlement agreement (MSA) requiring Robert, a practicing physician, to pay unallocated support to equalize the parties' base income. Citing the parties' respective net incomes at the time of dissolution, section 3(a) of the MSA required Robert to pay Phyllis approximately $2750 on a semimonthly basis to equalize the parties' base income. Section 3(b) of the MSA provided, in part,

> "Said payments shall continue until December 31, 2018, and shall be subject to review upon proper petition and notice filed by Wife (Petition to be filed prior to 12/31/18 or will be barred) to determine if, and to what extent, the Wife shall be entitled to any additional unallocated family support payments (or maintenance/child support), consistent with all applicable law."

The final provision of section 3(b) stated: "Other than hereinabove provided, unallocated family support shall be subject to modification or termination as provided pursuant to Section 510 of the Illinois Marriage and Dissolution of Marriage Act."

¶ 5        In June 2014, the trial court entered an agreed order modifying the MSA (Agreed Order). Robert was unrepresented at the time.[1] The Agreed Order replaced Robert's unallocated support obligation with fixed child support and maintenance obligations. Expressly abrogating the MSA's

---

[1]The record shows Robert was not present in court on June 26, 2014, when the Agreed Order was entered. On the nearest court dates when Robert's court presence was noted—February 21, July 31, and September 8, 2014—he appeared *pro se*. It was only on October 1, 2014, that Robert appeared with counsel.

income equalization requirement, the Agreed Order set maintenance payments at $3000 per month and child support payments at $3000 per month. The order described the new maintenance obligation as "non-modifiable and non-terminable." Nevertheless, it stated, "Maintenance shall continue and shall be subject to review as provided for in the existing [MSA] entered in this cause." Its final sentence provided, "[A]ll other terms and conditions of the [MSA] previously entered in this cause, not specifically modified by this agreement, shall remain in full force and effect." The trial court indicated "[t]he parties reached the agreement independent of counsel, with [Phyllis's] counsel then drafting the parties' agreement and entering the Agreed Order."[2]

¶ 6    In September 2018, Phyllis petitioned the court to extend the $3000 monthly maintenance on a permanent basis. Her petition highlighted Robert's noncompliance with various MSA provisions and court orders. Robert responded to her petition and, in January 2019, petitioned the court to "terminate, abate and/or reduce" his maintenance obligations. He argued his request was warranted by a substantial change in circumstances—namely, that his income had since plummeted due to bouts of unemployment and underemployment. Further, he alleged Phyllis had failed to take reasonable steps to become self-supporting, despite both of their children no longer being minors.

¶ 7    The cross-petitions led to an August 2022 hearing in which the parties disputed the scope of the court's review. Phyllis argued the court's maintenance review was limited to duration only, as the maintenance amount was nonmodifiable. In September 2022, the trial court agreed with Phyllis, finding its review limited to duration. "If extended," the court stated, "maintenance shall

_____

[2] The trial court conveyed this information in its written December 2022 decision, from which Robert now appeals.

3

continue at $3,000.00 per month as the parties agreed." Robert moved to reconsider, and the court took his motion under advisement.

¶ 8        The matter proceeded to a five-day evidentiary proceeding in October and November 2022. Both parties testified at this proceeding. In December 2022, the court denied Robert's motion to reconsider along with his petition to terminate, abate, or reduce maintenance. Emphasizing that the $3000 monthly amount was nonmodifiable under the Agreed Order, the court granted Phyllis's petition to extend maintenance, and provided that "[m]onthly maintenance of $3,000.00 is continued indefinitely, subject to statutory termination factors as set forth in the parties' MSA."

¶ 9        This appeal followed.

¶ 10                                      II. ANALYSIS

¶ 11        On appeal, Robert contends the trial court erred in declining to review the monthly maintenance amount and in awarding permanent maintenance without considering Phyllis's efforts to become financially independent. We address each contention in turn.

¶ 12                              A. Scope of Maintenance Review

¶ 13        Robert argues the $3000 maintenance amount was nonmodifiable for only a fixed term, which was set to expire on December 31, 2018. Phyllis, on the other hand, argues the Agreed Order did not limit nonmodifiability to a specific term, and the court correctly declined to review the maintenance amount.

¶ 14        The parties' dispute requires that we construe their MSA and the subsequent Agreed Order. Both instruments are subject to the rules of contract interpretation. *In re Marriage of Tutor*, 2011 IL App (2d) 100187, ¶ 13; *In re Marriage of Doermer*, 2011 IL App (1st) 101567, ¶ 27. Contract interpretation aims, principally, to effectuate the parties' intent. *In re Marriage of Woodrum*, 2018 IL App (3d) 170369, ¶ 108. That intent is best communicated by the contract's language, given its

4

plain and ordinary meaning. *Id.* A contract is construed as a whole, bearing in mind that words derive meaning from their context. *Id.* Where a written contract is unambiguous, the parties' intent is determined from the writing itself. *Frydman v. Horn Eye Center, Ltd.*, 286 Ill. App. 3d 853, 858 (1997). "Contracts which specifically incorporate other documents by reference are to be construed as a whole with those other documents." *Kirschenbaum v. Northwestern University*, 312 Ill. App. 3d 1017, 1029 (1999). Also, when possible, contracts are construed so that different provisions are harmonized and not conflicting with one another. *Henderson v. Roadway Express*, 308 Ill. App. 3d 546, 549 (1999). Contract interpretation presents a question of law, which we review *de novo*. *Id.* at 548.

¶ 15 The Agreed Order specifically incorporated the MSA by reference: "Maintenance shall continue and shall be subject to review as provided for in the existing [MSA] entered in this cause." It further provided, "[A]ll other terms and conditions of the [MSA] previously entered in this cause, not specifically modified by this agreement, shall remain in full force and effect." Accordingly, we construe the Agreed Order and MSA together. *Kirschenbaum*, 312 Ill. App. 3d at 1029.

¶ 16 Phyllis maintains that, under the Agreed Order, the $3000 maintenance amount was not subject to modification under any circumstances. We disagree. Phyllis's construction does not give due regard to the MSA's review provision. We begin by considering that provision in context. Section 3(b) of the MSA provides three triggers which terminate Robert's support obligation and one trigger which subjects his support obligation to court review. Section 3(b) provides, in pertinent part,

"(b) Said payments [*i.e.*, unallocated support payments] shall terminate upon the first to occur of the following events:

(1) The death of either party;

5

(2) The remarriage of the Wife;

(3) Should the Wife cohabitate with another person on a resident, continuing conjugal basis;

(4) Said payments shall continue until December 31, 2018, and shall be subject to review upon proper petition and notice filed by Wife (Petition to be filed prior to 12/31/18 or will be barred) to determine if, and to what extent, the Wife shall be entitled to any additional unallocated family support payments (or maintenance/child support), consistent with all applicable law. Until the Court modifies and/or terminates the existing order, the current support obligation shall remain in full force and effect with any modification or termination retroactive to the date of [*sic*] scheduled for termination.

\* \* \*

Other than hereinabove provided, unallocated family support shall be subject to modification or termination as provided pursuant to Section 510 of the Illinois Marriage and Dissolution of Marriage Act."

Under this section of the MSA, support payments terminate upon one of three triggers: (1) the death of either party, (2) Phyllis's remarriage, or (3) her cohabitation. The fourth trigger is found in section (b)(4), the review provision. It provides that (a) upon Phyllis's timely petition and (b) after December 31, 2018, Robert's support obligation shall be subject to review "to determine if, and *to what extent*, [Phyllis] shall be entitled to any additional unallocated family support payments (or maintenance/child support), consistent with all applicable law." (Emphasis added.) Crucially, the *extent* of any additional support subsumes both duration and amount. See Merriam-

6

Webster Online Dictionary, https://www.merriam-webster.com/dictionary/to%20what%20extent (last visited Nov. 6, 2023) (defining "to what extent" as "how far; how much"). Thus, under the MSA, the court's maintenance review is not limited to duration; it includes amount as well.

¶ 17 Section 3(b)'s final provision (prefaced by "[o]ther than hereinabove provided") states that Robert's support obligation is modifiable and terminable pursuant to the considerations of section 510 of the Marriage and Dissolution of Marriage Act (Act). See 750 ILCS 5/510(a-5) (West 2012) (maintenance order may be modified or terminated only upon showing of substantial change in circumstances). Notably, however, the possibility of section 510 modification or termination under the final provision is not associated with a specific timeframe and is "[o]ther than hereinabove provided." Thus, the final provision's operation is separate from, and secondary to, the four event-specific triggers for termination or review. Upon death, remarriage, or cohabitation, support payments terminate without regard for section 3(b)'s final provision. Further, upon Phyllis's timely petition to extend maintenance, the final provision must give way for the court's general maintenance review after December 31, 2018, "consistent with all applicable law."

¶ 18 We now move to the Agreed Order, which twice describes Robert's maintenance as "non-modifiable and non-terminable." Sections B and C of the Agreed Order provide, in pertinent part,

> "B. Effective June 1, 2014, [Robert] shall pay to [Phyllis], as and for non-modifiable and non-terminable maintenance, the sum of THREE THOUSAND AND NO/100 ($3,000.00) DOLLARS per month. By express agreement of the parties, said maintenance shall not be deductible by [Robert], nor includable in [Phyllis's] income. Maintenance shall continue and shall be subject to review as provided for in the existing Judgment for Dissolution of Marriage/Marital Settlement Agreement entered in this cause. Said payments shall be made and

7

delivered to [Phyllis] twice a month based on [Robert's] pay schedule ($1,500.00 every pay period). ***

C. Based upon the parties' agreement with respect to the payment of non-modifiable and non-terminable maintenance payments to be reviewed consistent with the terms and conditions of the existing Judgment for Dissolution of Marriage/Marital Settlement Agreement, [Phyllis] agrees that the prior Order of Court requiring [Robert] to equalize income shall be vacated and the payments hereinabove provided for shall be substituted in its place."

¶ 19    Because Phyllis's counsel drafted the Agreed Order, we construe its terms strictly against Phyllis. *Carvallo v. Carvallo*, 62 Ill. App. 3d 394, 399 (1978). The "non-modifiable and non-terminable" language abrogated the final provision of section 3(b) of the MSA, which expressly allowed for both modification and termination of Robert's support obligation. The "non-modifiable and non-terminable" language did not, however, modify the four triggers listed in section 3(b). Those triggers did not expressly raise modifiability and terminability in a manner that would lead one to conclude the Agreed Order was meant to affect them in any way. Indeed, if either party were to die, or if Phyllis were to remarry or cohabit, even a nonmodifiable and nonterminable support obligation would terminate. Similarly, upon Phyllis's timely petition and after December 31, 2018, a nonmodifiable and nonterminable support obligation would be subject to review to determine "if, and to what extent" Phyllis is entitled to additional support payments. The Agreed Order concludes with the following language: "[A]ll other terms and conditions of the [MSA] previously entered in this cause, *not specifically modified by this agreement*, shall remain in full force and effect." (Emphasis added.) Accordingly, because the Agreed Order did not specifically modify section 3(b)'s four triggers, they "remain in full force and effect."

8

¶ 20　　　　Phyllis stresses the term "non-modifiable" in the Agreed Order is evidence of the parties' intent to exclude the maintenance amount from later review. She argues, "Non-modifiable, without qualification, means non-modifiable. It does not mean non-modifiable until December 31, 2018, it does not mean non-modifiable during the initial maintenance term, nor does it mean non-modifiable subject to general review." Phyllis's rhetoric is belied by the Agreed Order's express incorporation of the MSA's review provision. Section B of the Agreed Order provides, "Maintenance *** shall be subject to review as provided for in the existing [MSA]." In addition, section C reiterates that review is "to be consistent with the terms and conditions of the existing [MSA]." Thus, even if we did not construe the Agreed Order strictly against Phyllis, it clearly defers to the MSA's review provision, without limiting the extent of review. We find the Agreed Order leaves the scope of review entirely to the MSA's terms.

¶ 21　　　　Moreover, we observe that Phyllis's rhetoric is unduly fixated on the word "non-modifiable." The Agreed Order, as Robert points out, describes the maintenance obligation as "non-modifiable and non-terminable." Thus, if Phyllis's unrestrained reading of "nonmodifiable" is to be accepted, it must logically extend to "non-terminable" as well. It does not. Phyllis's reasoning quickly unravels when "non-terminable" is substituted for "non-modifiable." Consider, for example: "Non-terminable, without qualification, means non-terminable. It does not mean non-terminable until December 31, 2018." Phyllis recognized that maintenance was, in fact, terminable after December 31, 2018. Her petition to extend maintenance indicated as much. Accordingly, we reject Phyllis's selective emphasis on "non-modifiable."

¶ 22　　　　In short, Robert's $3000 maintenance obligation was nonmodifiable and nonterminable only insofar as none of the four conditions in section 3(b) of the MSA were triggered. In this case, the fourth condition was triggered. Because Phyllis filed a timely petition to extend maintenance,

the trial court was required, after December 31, 2018, to review Robert's maintenance obligation, both its duration and amount, "consistent with all applicable law." The court's finding that it was precluded from reviewing the maintenance amount was in error. We therefore reverse that portion of its order and remand for the trial court to consider the proper amount of maintenance.

¶ 23 Finally, we observe that Phyllis filed her petition to extend maintenance in September 2018, after the effective date of section 504(b-8) of the Act. See Pub. Act 99-763 (eff. Jan. 1, 2017) (amending 750 ILCS 5/504). Section 504(b-8) provides, "Upon review of any previously ordered maintenance award, the court may extend maintenance for further review, extend maintenance for a fixed non-modifiable term, extend maintenance for an indefinite term, or permanently terminate maintenance *in accordance with subdivision (b-1)(1)(A) of this Section*." (Emphasis added.) 750 ILCS 5/504(b-8) (West 2018). Section 504(b-1)(1)(A) establishes guidelines for setting the maintenance amount.[3] 750 ILCS 5/504(b-1)(1)(A) (West 2018). Consequently, because subsection 504(b-8) was in effect at the time Phyllis petitioned to extend maintenance, the court's maintenance review is informed by section 504(b-1)(1)(A)'s guidelines. See *In re Marriage of Burdess*, 2020 IL App (3d) 190342, ¶ 21. We therefore direct the trial court, on remand, to conduct a review of the maintenance amount consistent with section 504(b-1)(1)(A) of the Act.

¶ 24           B. Permanent Maintenance

¶ 25 Next, Robert argues the trial court improperly awarded Phyllis permanent maintenance. According to him, Phyllis failed to demonstrate a continued need for maintenance and the trial

---

[3]Under a plain reading of section 504(b-8), only amount guidelines apply in a review proceeding; duration guidelines do not. Section 504(b-8) references subsection (b-1)(1)(A), which establishes amount guidelines, but does not reference subsection (b-1)(1)(B), which establishes duration guidelines. It is unclear why this is the case. Nevertheless, we must interpret the statute as written and may not, under the guise of statutory construction, correct perceived omissions or defects. *Spear v. Board of Education of North Shore School District No. 112*, 291 Ill. App. 3d 117, 119 (1997).

10

court's decision to extend maintenance did not consider evidence that Phyllis had achieved financial self-sufficiency and was effectively rehabilitated. "We will not reverse a trial court's determination on review, modification, or termination of maintenance absent an abuse of discretion." *In re Marriage of Burdess*, 2020 IL App (3d) 190342, ¶ 16. An abuse of discretion occurs where no reasonable person would take the view adopted by the trial court. *In re Marriage of Cheger*, 213 Ill. App. 3d 371, 378 (1991).

¶ 26        Robert's argument is premised on his claim that the parties agreed to rehabilitative maintenance when they signed the MSA. Rehabilitative maintenance is intended to assist and encourage dependent spouses to become financially independent. *In re Marriage of Van Hoveln*, 2018 IL App (4th) 180112, ¶ 30. A recipient of rehabilitative maintenance is "under an affirmative obligation to seek appropriate training and skills to become financially independent in the future." (Internal quotation marks omitted.) *Id.* "Permanent maintenance, however, is appropriate where it is evident that the recipient spouse is either unemployable or employable only at an income that is substantially lower than the previous standard of living." (Internal quotation marks omitted.) *Id.*

¶ 27        Robert acknowledges that neither the MSA nor the Agreed Order explicitly stated the rehabilitative nature of the maintenance award. He argues, however, that both instruments reference Section 510 of the Act, which addresses the goal of financial self-sufficiency. He further argues that the "public policy" behind the maintenance award's fixed term supports its rehabilitative nature. See *In re Marriage of Rodriguez*, 359 Ill. App. 3d 307, 312 (2005) ("The purpose of a time limit on the award is generally intended to motivate the recipient spouse to take the steps necessary to attain self-sufficiency.").

¶ 28        Robert's contention is governed by familiar principles of contract interpretation. Where an agreement's terms are clear and unambiguous, the parties' intent must be determined from the language of the agreement alone. *State Farm Fire & Casualty Co. v. Watts Regulator Co.*, 2016

11

IL App (2d) 160275, ¶ 27. "A court may resort to rules of construction only where the language of the agreement is ambiguous." *Id.* Robert does not argue that the MSA or Agreed Order is ambiguous. In fact, the parties agree that neither the MSA nor the Agreed Order placed an affirmative obligation on Phyllis to make efforts to become self-sufficient. Robert argues, instead, that we can infer the parties intended to make maintenance rehabilitative. We will not do that. "There is a strong presumption against provisions that easily could have been included in the contract but were not." *Klemp v. Hergott Group, Inc.*, 267 Ill. App. 3d 574, 581 (1994). "A court will not add another term about which an agreement is silent." *Id.* Robert, moreover, fails to provide case law support for his claim that the mere reference to section 510 is enough to impute a rehabilitative character to the maintenance award. Absent MSA language requiring Phyllis to become self-sufficient, we will not presume that her maintenance award was rehabilitative. The trial court was therefore not precluded from extending maintenance on a permanent basis.

¶ 29  Robert argues the trial court failed to consider Phyllis's efforts to become self-sufficient. We disagree. In its December 2022 ruling, the court outlined how Phyllis went from being a stay-at-home mother during the parties' 19-year marriage, to earning a $55,000 yearly salary as an insurance agent. The court concluded, however, that Phyllis "has not and cannot maintain any semblance of the standard of living she enjoyed during the marriage, despite commendable efforts to become self-sufficient."

¶ 30  The court's decision highlighted the parties' lavish lifestyle during their marriage, and juxtaposed it with Phyllis's diminished standard of living after the divorce. While married, the parties lived with no money worries, in a large, custom-built home, and traveled domestically and internationally. After the divorce, Phyllis rented a three-bedroom house for herself and the parties' two children. She later downsized to an 800-square-foot apartment when the children moved out.

She drove a 2011 Ford Escape and was now driving a 2008 Hyundai Tucson. Her adjusted gross income was $46,818 in 2021, $40,232 in 2020, and $35,798 in 2019. At the time of the hearing, Phyllis was 55 years old and earned a net monthly income of $3860.22 with a monthly deficit of $973.78. She testified her salary had plateaued at $55,000 and she would have to own or buy into an insurance agency to increase her income. Permanent maintenance is appropriate where the recipient spouse is employable only at an income substantially lower than her previous standard of living. *In re Marriage of Van Hoveln*, 2018 IL App (4th) 180112, ¶ 30. Based on the record before this court, we cannot say the trial court abused its discretion in extending maintenance on a permanent basis.

¶ 31                                III. CONCLUSION

¶ 32        The judgment of the circuit court of Will County is reversed in part, affirmed in part, and remanded for proceedings consistent with this order.

¶ 33        Reversed in part and affirmed in part; remanded with directions.