NOTICE
Decision filed 01/27/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 210065-U

NO. 5-21-0065

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| KRISTI BRITTON, | ) | Williamson County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 12-D-183 |
| | ) | |
| BRENT BRITTON, | ) | Honorable |
| | ) | Carey C. Gill, |
| Respondent-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's order requiring the respondent to reimburse the petitioner for the supplemental insurance is vacated due to a lack of subject matter jurisdiction; the trial court's order shifting the parties' obligation to provide health insurance is affirmed where both parties advised the court that the petitioner's insurance should be used and the respondent's obligation should cease; the trial court's order requiring the respondent to reimburse the petitioner for educational expenses incurred prior to the filing of the petitioner's modification petition is vacated; the trial court's finding that the respondent's income should be imputed is affirmed, but the amount of income determined by the trial court is vacated; the trial court's finding that the petitioner's proceeds from the sale of closely-held corporate stock received as part of the original property distribution should not be included as income is affirmed; and the trial court's calculation of child support and arrearage is vacated.

¶ 2    Respondent, Brent Britton, appeals the trial court's orders that (1) required him to

reimburse petitioner, Kristi Britton, for one-half of the cost of voluntarily-obtained supplemental

1

insurance; (2) shifted Brent's obligation to pay the children's health insurance premiums to Kristi; (3) ordered Brent to reimburse Kristi for educational expenses incurred prior to the filing of the modification petition; (4) imputed income to Brent; (5) determined Brent's gross monthly income was $14,529; (6) calculated Kristi's gross income without interest or capital gain stemming from a stock sale; and (7) calculated child support and awarded arrearage based on the erroneous findings for income. For the following reasons, we affirm in part, vacate in part, and remand for further proceedings.

¶ 3                                      I. BACKGROUND

¶ 4      Kristi and Brent were divorced on April 25, 2012. Two children were born of the marriage, K.B., born 05/02/2003, and A.B., born 02/09/2005. The parties entered into a marital settlement agreement (MSA) and a joint parenting agreement (JPA) that were incorporated into the judgment of dissolution. Pursuant to the JPA, the parties shared joint custody of the children with Kristi as the residential parent and Brent receiving parenting time. Pursuant to the MSA, Brent would pay $200 per week in child support and maintain health insurance on the minor children with each party responsible for "one half of all deductibles and expenses *** not covered by insurance." The parties also agreed to split the expenses for the children's extracurricular activities up to $500 per year. Based on the dissolution documents, both Brent and Kristi were employed, held equal shares of Britton Trucking, Inc., Britton's Wrecker Service, Inc., and Britton Transportation Services, Inc., and would continue to use their company cars following the divorce. No income was listed for either party.

¶ 5      On October 17, 2017, Kristi filed a petition to modify claiming that when the parties divorced, Brent's income was approximately $1030 per week. She alleged a substantial change in circumstances since the dissolution, claiming that Brent's income had increased substantially, the

2

needs of the minor children had changed, and the cost of providing for those needs had increased. On November 22, 2017, Brent admitted his income had increased substantially but denied the needs of the minor children had changed and the cost of providing for those needs increased.

¶ 6    On December 12, 2017, Brent filed a counterpetition to modify the joint parenting agreement stating, *inter alia*, that despite the joint custody classification, Kristi involved the children in numerous extracurricular activities without Brent's agreement which limited, hampered, or undermined his parenting time. Brent also contended that Kristi had enrolled K.B. in a private school in Missouri, against his wishes, which required him to drive 75-80 minutes each way to pick up and drop off K.B. at school. Brent also filed a petition for rule to show regarding his allegedly disrupted parenting time.

¶ 7    Kristi responded on December 21, 2017, admitting, *inter alia*, the parties mutually modified the prior parenting time agreement and that she permitted the children to become involved in the extracurricular activities. She affirmatively stated that she was "under no obligation to discuss or obtain the agreement of [Brent]" and claimed that prior to the filing he "never objected to the children's extra-curricular activities or the time they occur."

¶ 8    Following unsuccessful mediation, Kristi filed her financial affidavit on March 5, 2018. The affidavit listed her gross income in 2017 as $157,533, which included pension fund money used to build a house. It further listed her gross income in 2018 (through February 15, 2018) as $8070.10. Her gross monthly income, before taxes, was $7603.19, which included her employment ($4635.92), child support ($866.67), and payments for her shares of the Britton businesses ($1050.30). The document also revealed that her new husband's medical insurance policy covered her and the children.

3

¶ 9      On December 27, 2018, Kristi filed a petition to allow attorney fees stating she was without adequate funds to pay her attorney fees and that Brent earned "significant sums of money" and was "well able to pay" Kristi's incurred attorney fees. On the same date, Kristi also filed a petition for rule to show cause claiming that Brent refused and failed to pay reimbursement related to medical bills that were not covered by insurance and the children's extracurricular activities. Brent responded on January 10, 2019, admitting he was gainfully employed but denied the remainder of the allegations. Brent also denied that he refused to pay any medical expenses or his portion of the children's extracurricular activities.

¶ 10      Kristi filed an updated financial affidavit on July 25, 2019, and an amended financial affidavit on August 7, 2019. The amended financial affidavit listed gross monthly income of $6190.84. The document claimed that Kristi received $2100.60 from Brent "as part of their property settlement." The document again noted that Kristi and the minor children were covered under her new husband's health insurance policy.

¶ 11      On July 31, 2019, Brent filed a pretrial memorandum that included a financial affidavit dated July 30, 2019. The affidavit stated his gross income in 2018 was $55,768 and $21,750 in 2019 (through July 26, 2019). The affidavit listed Brent's gross monthly income as $4902.42. He claimed that his total available monthly income was negative $2594.31. Brent's tax returns were attached to the pleading.

¶ 12      On August 8, 2019, the parties proceeded to hearing. The trial court noted all pending pleadings and stated the parties would present the evidence and testimony related to the children first; thereafter, the court would proceed on the financial issues. Following the hearing, the trial court ordered joint decision making as to the extracurricular activities, stated that K.B. would continue to attend private school in Missouri, and amended the parenting time schedule to provide

4

additional time to Brent so long as the children were taken to all scheduled activities. The order reserved ruling on holiday parenting time.

¶ 13    Kristi filed a "second corrected child support calculation" on October 30, 2019, based on the new parenting time allocation. The document listed Brent's income as $176,569 in 2018, $216,305 in 2017, and $293,917 in 2016. The income amounts included section 179 (26 U.S.C. § 179 (2018)) deductions of $107,700 in 2018, $174,322 in 2017, and $118,133 in 2016 reported on Brent's business taxes. Kristi averaged these amounts, divided the average by 12, and claimed Brent's monthly income was $19,077.

¶ 14    On October 31, 2019, the trial court issued its order as to holiday parenting time and reset the financial hearing for a later date. At the hearing, Kristi tendered 22 exhibits for the financial hearing with no objection from Brent and Brent submitted an amended financial affidavit. Brent's amended financial affidavit listed gross income of $98,070.01 in 2018 and total gross income in 2019 (through October 25, 2019) as $73,495.80. The affidavit listed $6618.33 in monthly gross income comprised of $3117.50 in regular employment earnings, $135.42 in rental income, $2613.87 in distribution and draws, and $1618.21 in-kind payment of health insurance from his business. The affidavit listed Brent's total available monthly income as negative $3447.63.

¶ 15    On December 26, 2019, Kristi filed an amended petition to modify. The amended petition requested an increase in child support (as before) and contribution from Brent towards the children's educational expenses, including private school tuition, fees, books, lunches, and extracurricular activities. Brent's January 13, 2020, response denied that his income increased significantly but agreed the needs of the minor children changed and increased. Brent admitted the remaining allegations but denied Kristi was the sole source of funding for private school because

he had been paying child support for the benefit of the children since the judgment of dissolution was entered and contended both parties should contribute to the support of the children.

¶ 16    On February 13, 2020, the case proceeded to hearing on the remaining financial issues. Kristi testified that she was 39 years old and was employed by University of Illinois Extension where she worked as a youth development educator. She stated that her amended financial affidavit incorporated the raise she received the previous year, and she recently received another raise. Kristi stated the children attended school at Saxony Lutheran in Jackson, Missouri, and the monthly tuition was $1075. The children's lunches were an additional $140 per month. She stated that she had always been the only person to pay their tuition and that the children attended private school since kindergarten. Kristi stated that she sold her ownership of the Britton businesses back to Brent and those monthly amounts were included in her income on her financial affidavit. On cross-examination, Kristi confirmed that her future State of Illinois salary was $57,907.25. She also had additional income in the amount of $2100 per month for the sale of the business stock to Brent. She admitted the total amount received was $22,897 and listed as a capital gain on her 2018 tax return.

¶ 17    Brent testified that he was 39 years old and was the owner of Britton Trucking, Inc., Britton Transportation Services, Inc., and Britton's Wrecker Service, Inc. Britton Trucking owned the land and building where it sat and rented it to the wrecker service. Britton Transportation Services, Inc., operated as a separate company because the federal motor carrier rules did not allow a broker license in the same name of the trucking company, so it was for the broker license only. Britton's Wrecker Service, Inc., was a towing recovery business with locations in Metropolis, Vienna, and Mounds, Illinois. Each location had its own heavy duty, light duty, and service trucks. Brent confirmed the copies of his 2016, 2017, and 2018 tax returns. He also confirmed that his total

household income listed on the tax returns was $87,976 in 2018, $152,530 in 2017, and $128,897 in 2016.

¶ 18    Brent was provided copies of his July 30, 2019, and October 25, 2019, affidavits and was asked about the discrepancies in the numbers during that three-month period. He confirmed that he did not make $53,000 in three months. He stated that he was provided the first affidavit 12 hours before it was due, and he prepared the second one after he sat down with his accountant. His accountant told him he had to include distributions from the company which was classified as partnership distribution money. They calculated all those numbers and separated them out to make the second affidavit more accurate, which also included his health insurance. Brent agreed that based on his affidavit, he was spending $40,000 more a year than he was making.

¶ 19    Brent agreed that his real estate taxes were higher on the second affidavit because it was revised to be more accurate. He stated that the mortgage listed on the affidavit was one-half of the actual amount, the homeowner's insurance was the full amount, and the electric bill was probably one-half of the actual amount. The amounts for cable and internet were the full amounts. Groceries were about $100 each week on average. Brent also stated that the car payment was double what it showed. Repairs and maintenance along with insurance, license, and stickers were also "probably double that." Brent stated that the personal expenses listed on his affidavit were accurate and included only his medical expenses. Brent confirmed that the household also paid medical expenses for his wife. He was unsure how much he paid in out-of-pocket expenses for his wife the year before. He thought they met their deductible, which he believed was $3500 per person.

¶ 20    Brent agreed that he included $300 per month for vacations and stated it was an average of what he figured for himself. He agreed it would be double if they included his wife and more yet if they included the children. He testified that he went on one cruise that year and five people went

7

on the cruise. He stated it was about $789 per person and with taxes it cost about $3600. Counsel then stated that it would be $600 a month on average if his wife was included. Brent asked, "You want to include her portion in this too?" Counsel stated, "Well her income is on your tax return, isn't it?" Brent confirmed that it was.

¶ 21    Brent was then asked about the $480 per month listed for doctor's visits for his children and the claimed medical expense of over $5000 per year. Brent explained that his son had a kidney problem, and they were going to St. Louis on a regular basis. Brent also confirmed the average monthly attorney fee of $1001.20. and the annual attorney fee of $12,000 in 2019. Brent agreed his prior financial affidavit did not include attorney fees. Brent confirmed he currently had no attorney fee debt. He agreed that he did not provide the fair market value of his businesses, stating it would be hard to estimate without appraisals.

¶ 22    Brent confirmed that he ran a deficit of $3447 a month. Kristi's counsel stated that doubling the expenses would increase the deficit by over $2500, for a total of $6000 a month, and asked Brent, "So *** that $72,000.00 a year that you're spending in excess of your income. Where does that money come from?" Brent stated it was all solely based of his personal income. Counsel again asked, "Okay, back to where I was, where does this $72,000.00 come from that you spend in excess of your income based upon your Financial Affidavit?" Brent stated that his wife worked too and up until recently she had worked every day. Brent confirmed that his total household income listed on his 2018 taxes was $87,000. Counsel then asked again, "Where does the extra money come from that your budget reflects you spend above and beyond your income?" Brent stated, "If you look in the tax returns on the back side where it shows distributions on those pages, those distributions are reflections to this. So, those distributions are directly distributed to me. My wife owns a business as well. Some of them are distributed directly to her." Brent confirmed that his

monthly business distributions were listed as $2613.87 on his financial affidavit and that the amount was included in the $6618.33 listed as his total income on the financial affidavit. Counsel stated that "with the distributions you have shown on this Financial Affidavit, you got the $3447.00 deficit every month." Brent stated, "I did something wrong. I don't know. I really can't answer that question 100 percent. I don't know how. I done something wrong." Counsel then asked, "Would it be fair to say you don't know where all distributions come from that you incorporate into your living expenses?" Brent replied, "No, that would not be. *** [T]he distributions come from the corporations. The corporations are itemized in the tax returns of the distributions *** but I did this on a basis, so I really don't know the answer to that question. Sorry." Counsel then stated, "Let me ask the question another way. Would it be fair to say that you get distributions that go to your monthly living expenses that don't show up on your tax return as taxable income?" Brent stated, "No." He again confirmed the gross family income on the 2018 tax return as $87,976.

¶ 23     Brent stated that he lived in Tunnel Hill on six acres. He stated that the wrecker service owned 113 acres that adjoined his property and agreed that he moved dirt on that property to create a pond. He explained that they were flattening a hill to build a building in the future and stop erosion on the property. He agreed that he kept horses on the property. He stated that the 113-acre parcel was the future location for his business because he needed a bigger lot and building where all the vehicles could be parked. He stated the price was cheaper than buying five acres in town. All the trucks, including the wrecked semis, could be parked on the future location. He agreed the company made the monthly payment on the 113 acres. He stated that 23 acres of the property were fenced and that was where he kept his horses. He agreed that none of the trucks were on the 23 acres, and he currently had no business use on the 23 acres.

9

¶ 24    On cross-examination, Brent confirmed that, other than the 23 acres, there were no other monthly expenses that he had or that his wife had, that were paid by the business and that anything that was paid by the business was distributed on the tax returns. He agreed that a few of the expenses on his affidavit were paid by the business but they reflected the income for that on the affidavit which included the health insurance payment. Brent had an accountant who prepared both his personal and the business income taxes. The accountant would come in once a month and work with the secretary to keep everything current. Brent stated that some of his businesses had very substantial purchases in the last few years, including wreckers and equipment, which were reasonable and necessary expenses associated with the business. He stated there were three wrecker services with equipment at each location. Brent testified that the section 179 expenses were necessary for the business and the information was contained in the tax returns. He was unaware of any IRS or State of Illinois challenge to his tax returns. He further confirmed that no state or federal agency ever challenged the section 179 expenses set forth on the tax returns.

¶ 25    On redirect, Kristi's counsel stated that Brent had roughly $72,000 more in expenses than his tax return reflected in income and again asked Brent where he was getting the money to pay these expenses each month. Brent stated that counsel's statement was incorrect. He stated there were certain expenses, such as the property tax and health insurance, that the company directly wrote checks for and that showed up on his tax returns, but it was not listed as personal income. He included his half of that on his affidavit. He stated that some of the distributions went to his wife and those were not listed on his financial affidavit. He disagreed with counsel's claim of a $70,000 error. Brent stated that he went over the numbers in detail with his accountant. He did not believe that his deficit was greater than was shown on his affidavit.

¶ 26    On recross, Brent disagreed that he had roughly $70,000 in excess every month that was paid toward his individual bills. On redirect, Kristi's counsel again asked Brent how the expenses were being paid if he did not have the extra money or new debt to show they were not being paid. Brent responded that he did not have those kinds of expenses.

¶ 27    Following a break, Brent's counsel called Brent back to the stand. Brent confirmed that his 2018 tax return contained income for both him and his wife. He stated his tax returns also contained the K-1s that showed the amounts of income for distributions from the business. Brent's financial affidavit listed an income of $98,070.01. Brent agreed that his tax return reflected a different amount of income. He agreed that his expenses, that were partially or in-whole paid by the company, were accounted for in the distributions shown on his tax returns. This included the mortgage, real estate taxes, insurance, cell phone, car payments, and gasoline. He confirmed that his wife had income she received in addition to what was reported on his financial affidavit. He disagreed that the $70,000 in expenses existed. On cross-examination, Brent confirmed that he received $55,120 in wages from Britton's Wrecker Service and his wife was paid $11,414.

¶ 28    The court stated it would allow the parties to submit posthearing briefs on the issue of Brent's income and the child support calculation. The court also asked about Kristi's health insurance. Kristi's counsel clarified the issue was whether the secondary insurance, covered at his client's cost, should benefit Brent, or only applied toward Kristi's share of the noncovered medicals. After discussing the health insurance issue, the court stated:

"All right. I am going to rule on this. I don't want a brief on the health insurance. What I am going to rule is for that amount that was paid before, he is going credit—give her $50.00 a month for each of the months that she paid the $100.00. You're both responsible for

11

health insurance. \*\*\* That's my ruling. Going forward, I would hope that you can resolve it. I have ruled on the health insurance."

¶ 29　The court then moved on to the educational expenses. Brent's counsel stated that the parties should share the cost of the tuition with each paying half. The court asked Kristi's counsel if she was asking for something different than that, and he said, "No, your Honor." Thereafter, the court stated, "All right. And that will go back for the entire time that the child was in school—that the children were in school; is that correct, Mr. Reed?" Kristi's counsel stated, "If the court would consider making it that far retroactive, your Honor." Brent's counsel asked that it only go "from the date of the order forward."

¶ 30　Thereafter, the court noted four issues: (1) the party's net income for child support, (2) educational expenses and extracurricular expenses, (3) petitioner's voluntary health insurance, and (4) attorney fees, and stated:

"All right. As to net income, I will permit the petitioner to file an updated pay stub to calculate her net income. I am going to impute some income to respondent. I will permit the parties to brief the amount of imputed income and also arguments as to Section 179 deductions. \*\*\* [T]his \*\*\* ruling \*\*\* is significant because I find the testimony of the respondent not credible as to his actual income and expenses.

　　Sir, your testimony, unfortunately, doesn't give me the ability to figure out what your income is. Accountants and preparation of tax returns can maybe, let's say, massage the numbers to give you better tax advantage or to do things, but you have to know what you earn, and you have to know what you pay, and you have to be candid with the Court. I don't \*\*\* find that your Financial Affidavit was not accurate. I think the one thing that I can say was that likely did not reflect your actual expenses and your actual income. I heard

12

testimony that there were things listed as your expenses that the company paid. Sounded like that might have also been included as income that you brought in that you had included as your income but then you subtracted it out as your expense[,] but it wasn't your expense. It likely should have just been included in your income because it was in-kind payment to you, but you were paying out the expense. It was an in-kind payment to you because they paid it for you, but it was very difficult to follow, and not answering the questions doesn't give me the information that I need *** to determine your net income. So, I am going to permit counsel to brief those amounts. You will be imputed some income. I do find that the one thing I know is that you're making more income than what your affidavit says. The question is[,] how much more.

As to educational expenses and extracurricular expenses, I am going to rule that the education expenses shall be shared 50/50 by the parties retroactive to the start of the school year for 2019-2020. *** I will allow you to tender that agreement as to what that's going to look like. There is going to be a refund from the respondent to the petitioner for what's been paid for 2019-2020 school year or whether you are going to alternate payments on years. I will permit that to be tendered to me by agreement. If you don't reach an agreement, I will come up with a way that I will order.

The parenting *** [p]lan remains as previously entered regarding the extracurricular activities. So, it's going to stay what it was. Share in it up to that dollar amount, and I will let counsel look at what that was. But my ruling is that I find no reason to change that."

¶ 31 After confirming that Kristi had been paying the voluntary health insurance premiums since June of 2014, and hearing arguments from counsel, the court continued:

13

"All right. We're not going to go back an indefinite amount of time, but we're going to—you're going to pay 50 percent of those voluntary premiums from 2018 to the present from January 1st, 2018[,] to the present."

¶ 32 The court also stated:

"All right. Future calculation of the child support shall take into consideration all payments of health insurance regardless of where they fall. That should be able to be accomplished under the new format. If it's not, counsel, you can let me know and we'll figure out what we're going to do. Perhaps it's just better to look at what insurance is best and cheapest and most accommodating.

Fourth, petitioner's request for contribution to attorney's fees, um, I am going to reserve ruling and permit briefs on that issue."

¶ 33 The trial court ordered Brent to provide the tax, mortgage, and insurance information related to the 23 acres of the 113 acres owned by his business that was used to house the horses. The trial court's February 13, 2020, docket hearing entry confirmed, *inter alia*, that education expenses would be shared 50/50 by the parties, "retroactive to the start of the school year or 2019-2020," and Brent was required to "pay for 50% of [Kristi's] voluntary [health insurance] premiums from 1/1/2018 to present."

¶ 34 Kristi filed an updated paystub with the court on February 20, 2020, that listed her gross monthly income as $4825.60. Following submission of the posthearing briefs, which included Kristi's claim that Brent's monthly net income was $15,263 and Brent's claim that his 2018 monthly gross income was $7636.78, and a hearing on June 16, 2020, at which time the court heard arguments as to whether petitioner's income should include money from the sale of the stock to Brent, the court issued a docket entry ruling that found:

14

"1. THAT SAID STOCK SHALL NOT BE INCLUDED IN PETITIONER'S NET INCOME AS IT IS MORE IN THE NATURE OF SHARES OF STOCK CAPABLE OF BEING SOLD (*IN RE MARRIAGE OF MARSH*, 2013 ILL. APP. (2D) 130423 (2013)), RATHER THAN UNVESTED STOCK OPTIONS (*IN RE MARRIAGE OF COLANGELO*, 355 ILL. APP. 3D 383 (2005)).

2. HEALTH INSURANCE SHALL BE SHARED 50/50 BY PARTIES. MINOR CHILDREN SHALL BE COVERED UNDER HEALTH INSURANCE OF PETITIONER, SO LONG AS IT IS MORE COST-EFFECTIVE TO HAVE SAID COVERAGE, OR BY AGREEMENT OF THE PARTIES.

3. INCOME OF RESPONDENT (AS TO ACTUAL AND IMPUTED) IS TAKEN UNDER ADVISEMENT.

4. PETITIONER'S REQUEST FOR ATTORNEY'S FEES IS DENIED.

COURT RULES THAT RESPONDENT['S] GROSS INCOME (AS TO ACTUAL AND IMPUTED) IS SET AT $14,529.00 PER MONTH."

¶ 35    The child support calculations were submitted on July 15, 2020. On September 29, 2020, the trial court issued a docket entry order finding that Brent's child support obligation beginning in September 2020 would be $1010.66. The court also noted the new issue arose toward arrearages and set the matter for a hearing which was held on November 24, 2020. Both parties filed their closing arguments on child support arrearage on December 22, 2020.

¶ 36    On February 5, 2021, the trial court issued a docket entry order that ordered child support arrearage back to November 1, 2017. Thereafter the court found that Brent's child support from (1) November 2017 to July 2019 was $1538.26 per month, (2) August 2019 to August 2020 was

15

$785.56, and (3) September 2020 going forward was $1010.66 per month. On March 5, 2021, Brent appealed.

¶ 37                                                    II. ANALYSIS

¶ 38    On appeal, Brent contends that the trial court (1) did not have subject matter jurisdiction to order him to pay one half of Kristi's supplemental health insurance policy or revise the health insurance obligation; (2) did not have subject matter jurisdiction to award educational expenses prior to the date Kristi filed her amended petition to modify; (3) erred when imputing income to Brent; (4) erred when it calculated Brent's net income from the erroneous gross income; (5) erred when it calculated Kristi's gross income without interest or capital gain; and (6) erred in calculating the child support and arrearage based on the erroneous incomes.

¶ 39                          Health Insurance—Kristi's Supplemental Policy

¶ 40    Whether a court has subject matter jurisdiction to grant the relief provided is a question of law that is reviewed *de novo*. *In re Marriage of Chrobak*, 349 Ill. App. 3d 894, 897 (2004). Decisions issued without jurisdiction are void. *Ligon v. Williams*, 264 Ill. App. 3d 701, 707 (1994). As noted by *Ligon*:

> "The court's authority to exercise its jurisdiction and resolve a justiciable question is
>
> invoked through the filing of a complaint or petition. [Citations.] These pleadings function
>
> to frame the issues for the trial court and to circumscribe the relief the court is empowered
>
> to order; a party cannot be granted relief in the absence of corresponding pleadings.
>
> [Citations.] Thus, the circuit court's jurisdiction, while plenary, is not boundless, and where

16

no justiciable issue is presented to the court through proper pleadings, the court cannot adjudicate an issue *sua sponte*." *Id.*

¶ 41 The April 25, 2012, MSA stated that Brent "shall maintain health insurance" on the children and "each party shall be responsible for payment of one-half of all deductibles and expenses" not covered by insurance. None of the parties' pleadings requested a contribution from Brent toward the supplemental insurance. The relevance of Kristi's health insurance stemmed from the hearing on Kristi's petition for rule to show cause at which time it was determined that Kristi voluntarily obtained supplemental health insurance on the children, via her new husband's insurance at a cost of $100 per month, which covered amounts not paid by Brent's primary health insurance on the children. The issue was whether Brent could take advantage of the supplemental policy towards his portion of the amounts remaining due after his insurance was used or if the supplemental policy only applied to Kristi's portion. Following the February 13, 2020, hearing, the trial court's docket entry order stated, *inter alia*, that "Respondent [Brent] shall pay for 50% of those voluntary premiums from 1/1/2018 to the present."

¶ 42 " '[A] judgment, order or decree entered by a court which lacks jurisdiction of the parties or of the subject matter, or which lacks the inherent power to make or enter the particular order involved, is void and may be attacked at any time or in any court, either directly or collaterally.' " (Emphasis omitted.) *R.W. Sawant & Co. v. Allied Programs Corp.*, 111 Ill. 2d 304, 309 (1986) (quoting *Barnard v. Michael*, 392 Ill. 130, 135 (1945)). On appeal, Kristi argues that the trial court's ruling was proper based on her rule to show cause prayer for relief which requested, "judgment be entered in favor of petitioner and against the respondent for all sums found due."

¶ 43 However, the purpose of a rule to show cause petition is to determine if a party has complied with a prior court order, allows the allegedly noncompliant party the opportunity to

17

explain any noncompliance and, if necessary, allows the trial court to enforce the prior court order. See *In re Marriage of LaTour*, 241 Ill. App. 3d 500, 508 (1993). No part of the parties' MSA required Brent to pay 50% of Kristi's supplemental insurance. As such, the trial court's order requiring Brent to pay 50% of Kristi's supplemental insurance from January 1, 2018 (11 months prior to the filing of Kristi's rule to show cause petition), to February 13, 2020, pursuant to Kristi's rule to show cause petition is void for a lack of subject matter jurisdiction.

¶ 44                     Health Insurance—Modification of the Obligation

¶ 45    Following the June 16, 2020, hearing, the trial court also modified the MSA to remove Brent's obligation to pay for health insurance and placed the obligation on Kristi. On appeal, Brent contends that the trial court was without jurisdiction to make this modification. In response, Kristi contends that the trial court's ruling was exactly what Brent requested in Respondent's Demonstrative Aid Exhibit 1 filed with the court during the February 13, 2020, hearing. Kristi also argues that because health insurance is incorporated with child support that her petition to modify child support also covers the health insurance.

¶ 46    While Brent contends on appeal that no petition to modify the health insurance obligation was before the court, there is no dispute that both parties submitted documentation to the trial court permitting the modification. On February 13, 2020, Brent submitted what was catalogued as Respondent's Demonstrative Aid #1 with the court. In that document, Brent stated, "As this Court can see, the Aids contemplate Respondent (Father) no longer carrying health insurance for the children. There is no reason for both parties to carry health insurance and Petitioner (Mother's) policy is a much more inexpensive policy."

¶ 47    On July 15, 2020, Kristi's counsel sent correspondence to the court that stated, *inter alia*, "The parties have agreed that primary coverage will be through Kristi's *** employment and that

18

they will be dividing equally the portion of the premium attributable to their children." The remainder of this issue addressed the proposed order and the need to start the process for coverage.

¶ 48 Later that same day, Brent's counsel submitted his child support calculations. His pleading advised the court, "This Court further Ordered the parties to determine what the best insurance situation would be and equally share in the cost of such health insurance. This has not been finalized by the Parties and is still being worked on." However, the pleading further stated that placing an arrearage burden on Brent would "cause an unnecessary financial hardship going forward especially *in light of the fact that Respondent is* going to continue to pay one-half of the tuition, *paying one-half of the health insurance*, and also paying child support on the imputed income set by the Court." (Emphases added.) Nothing in Brent's pleading contradicted the statements by Kristi's counsel regarding the health insurance agreement.

¶ 49 "Under the invited-error doctrine, a party cannot acquiesce to the manner in which the trial court proceeds and later claim on appeal that the trial court's actions constituted error." (Internal quotation marks omitted.) *Direct Auto Insurance Co. v. Bahena*, 2019 IL App (1st) 172918, ¶ 36. "A party cannot invite an error by the trial court and then use it as a basis for appeal." *Id*. Here, the record reveals that both parties invited the trial court to issue an order modifying the MSA's health insurance obligation to Kristi and that both parties would contribute equally toward that premium. As such, we find the trial court did not err in modifying the health insurance obligation.

¶ 50                                        Education Expenses

¶ 51 Kristi's amended petition to modify support requested contribution from Brent toward the children's education expenses and was filed on December 26, 2019. The trial court's oral February 13, 2020, order ruled that "education expenses shall be shared 50/50 by the parties, *retroactive to*

*the start of the school year or 2019-2020.*" (Emphasis added.) The trial court's February 5, 2021, docket entry order clarified this was "essentially relating back to August 2019."

¶ 52    There is no dispute that the trial court's order was retroactive to the start of the school year, which was prior to the filing of the amended petition to modify. While Kristi contends on appeal that the order should be interpreted in a manner that would not require Brent to pay any of the retroactive education expenses, Kristi's interpretation is not what the trial court ordered.

¶ 53    Section 510(a) of the Illinois Marriage and Dissolution of Marriage Act states, "Except as otherwise provided in paragraph (f) of Section 502 and in subsection (b), clause (3) of Section 505.2,[1] the provisions of any judgment respecting maintenance or support may be modified only as to installments accruing subsequent to due notice by the moving party of the filing of the motion for modification." 750 ILCS 5/510(a) (West 2018). "[O]nce a petition has been filed and upon a showing of a substantial change in circumstances, support payments *can* be modified as of the date the petition was filed." (Emphasis in original.) *In re Marriage of Heil*, 233 Ill. App. 3d 888, 895 (1992). As the trial court's order was retroactive prior to the date that Kristi filed the amended petition addressing the educational expenses, the order was contrary to law, and therefore, must be vacated.

¶ 54                                     Imputed Income

¶ 55    "In order to impute income to a party, the court must find that the payor is voluntarily unemployed, is attempting to evade a support obligation, or has unreasonably failed to take advantage of an employment opportunity." *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 44. "If none of these factors are in evidence, the court may not impute income to the noncustodial

---

[1]Neither of these sections are applicable here.

20

parent." *In re Marriage of Gosney*, 394 Ill. App. 3d 1073, 1077 (2009). The court's decision to impute income is reviewed under an abuse of discretion standard. *Id.*

¶ 56    Here, Brent claims that the trial court erred by imputing his income because it failed to provide one of the three above-stated reasons for the finding. However, the trial court found that Brent's testimony regarding his income was not credible at the February 13, 2020, hearing. One of the issues at that hearing was "the setting of respondent's income" to determine child support pursuant to Kristi's petition to modify. Given the trial court's finding, and the undisputed issue at the hearing, we conclude that the trial court imputed income to Brent because it believed that he was attempting to evade a support obligation. As such, the trial court's finding that Brent's income could be imputed is not against the manifest weight of the evidence.

¶ 57                              Amount of Imputed Income

¶ 58    A trial court's determination of income is reviewed under an abuse of discretion standard. *Id.* "The amount of income imputed by the court must be supported by evidence showing that it is commensurate with the supporting parent's skills and experience." *Liszka*, 2016 IL App (3d) 150238, ¶ 46. The amount "should be based on his earning capacity, not his spending habits." *Id.* ¶ 50.

¶ 59    Here, Brent's income stemmed from his employment and ownership of the Britton enterprises. The legislature provided the following guidance for calculating business income:

"For purposes of calculating child support, net business income from the operation of a business means gross receipts minus ordinary and necessary expenses required to carry on the trade or business. *** The court shall apply the following:

(A) The accelerated component of depreciation and any business expenses determined either judicially or administratively to be inappropriate or excessive

21

shall be excluded from the total of ordinary and necessary business expenses to be deducted in the determination of net business income from gross business income.

(B) Any item of reimbursement or in-kind payment received by a parent from a business, including, but not limited to, a company car, reimbursed meals, free housing, or a housing allowance, shall be counted as income if not otherwise included in the recipient's gross income, if the item is significant in amount and reduces personal expenses." 750 ILCS 5/505(a)(3.1) (West Supp. 2017).

¶ 60    Our colleagues addressed the 2017 statutory change related to section 505(a)(3.1)(A) in *In re Marriage of Hochstatter*, 2020 IL App (3d) 190132, ¶ 24, stating:

"It is clear that section 505(a)(3.1)(A) now explicitly excludes accelerated depreciation from the calculation of net business income and does not explicitly mention nonaccelerated depreciation. [Citation.] The implication from the continued omission of nonaccelerated depreciation from the plain language of the statute is that it could still be deducted, but only if the court, *in its discretion*, determines it to be an appropriate and reasonable business expense that is required to carry on the trade or business. [Citation.] At a fundamental level, this is no different than the way nonaccelerated depreciation was handled in the preamendment version of section 505." (Emphasis in original.)

¶ 61    This court agreed with the *Hochstatter* discussion in *In re Marriage of Burnett*, 2021 IL App (5th) 200326-U. In *Burnett*, we addressed depreciation and noted that

"under section 505, the court must first determine if any amount of the claimed depreciation is accelerated depreciation. If so, that amount must be excluded as it is not allowed when calculating income for the purposes of determining child support. Then the trial court must look at the nonaccelerated depreciation and decide as to whether the depreciation is an

22

appropriate and reasonable business expense that is required to carry on the business." *Id.* ¶ 149.

¶ 62 The trial court found that Brent's imputed monthly gross income was $14,529. On appeal, Brent argues that the basis of the trial court's imputed gross income was unknown and therefore its finding of net income was erroneous. Kristi agrees that the trial court's gross income was not supported by the evidence and now argues that Brent's net income should have been set at $18,721.59, because Brent's gross monthly income should include the section 179 deductions, or, in the alternative, Brent's living expenses.[2] The parties correctly note that the trial court provided no basis for Brent's income calculation or discussion as to whether the amount was determined pursuant to the business deductions or by Brent's living expenses. As such, we decline to affirm the trial court's finding.

¶ 63 Regarding the business deductions, Brent's tax forms specifically set forth the amount and type of depreciation for his businesses. Just as in *Burnett*, the tax depreciation report revealed the total depreciation; here the total was $340,653. The report also documented the "Method" used for depreciation, which included the use of "DB" or "Declining Balance" methods, which are accelerated depreciation methods. Of the total deductions, over $300,000 used the "Declining Balance" accelerated depreciation method. There was no finding by the trial court that any of the businesses' accelerated depreciation was inappropriate or excessive; nor was any evidence submitted before the trial court that any administrative proceeding made such finding. As such,

---

[2]"Ordinarily, when an appellee does not file a cross-appeal, the reviewing court will be confined to the issues presented by the appellant and will not consider issues presented by the appellee, except to the extent that they are related to the appellant's issues." *People ex rel. Vuagniaux v. City of Edwardsville*, 284 Ill. App. 3d 407, 415 (1996). While there is no dispute that Kristi failed to file a cross-appeal pursuant to Illinois Supreme Court Rule 303(a)(3) (eff. July 1, 2017), it is equally undisputed that the argument involves the same issue raised by appellant. As such, we will consider Kristi's argument.

the accelerated depreciation amounts must be excluded from Brent's income calculation under section 505.

¶ 64    The remaining nonaccelerated depreciation must also be considered. In this regard, "[a]ssuming no other aspect of the statute prohibits a particular type of deduction, the trial court can now review each case and in its discretion determine whether a deducted expense is one which is 'ordinary and necessary *** to carry on the trade or business.' " *Id.* ¶ 144. The requirement to prove the deducted nonaccelerated expense was repayment for debt has been eliminated. *Id.*

¶ 65    Regarding Brent's living expenses, we do not find Kristi's alternative argument persuasive. Brent testified that his affidavit included his half of the business distributions which included his mortgage ($656.43), electric bill ($280.89), repairs and maintenance ($125), and license and stickers ($142.50), which equates to $1204.82 in section 505(a)(3.1)(B) in-kind income. Brent also testified that the business pays 100% of his cell phone ($36.17), his gas ($246.99), his vehicle ($475.56), and his health insurance ($1618.21), which equates to an additional $2376.93 in section 505(a)(3.1)(B) in-kind income for a total of $3581.75.

¶ 66    Brent's testimony was consistent with his affidavit that revealed $2613.87 in business distribution and draws, and $1618.21 for his health insurance which equated to $4232.08, an amount slightly higher than his testimony, that was added to his $3117.50 in regular earnings and $135.42 in rental income to determine his gross monthly income of $7485.

¶ 67    The remaining "expenses" claimed by Kristi consist of Brent's vacation, his wife's medical bills, his wife's personal expenses for clothing and grooming, the money used to purchase Kristi's stock, and the mortgage, property tax, and insurance related to the 113 acres. Contrary to Kristi's argument, the record reveals no testimony, or evidence, that any of the Britton businesses paid any portion of Brent's vacation, his wife's medical bills, his wife's personal expenses, or purchased

24

Kristi's stock. As such, Brent's spending habits are irrelevant and of no merit. *Liszka*, 2016 IL App (3d) 150238, ¶ 46.

¶ 68    Only Kristi's claim regarding the monthly expenses associated with the 113 acres has merit because this would also be section 505(a)(3.1)(B) in-kind income. We note, however, that Kristi's closing argument requested the trial court impute $257 to Brent's monthly gross income, stating his use of the 23 acres accounted for 20% of the $1285 monthly payment. On appeal, Kristi now contends that the entire $1285 monthly payment should be imputed to Brent. "A party cannot invite an error by the trial court and then use it as a basis for appeal." *Direct Auto Insurance Co.*, 2019 IL App (1st) 172918, ¶ 36.

¶ 69    Here, it appears the trial court may have been persuaded by Kristi's erroneous arguments related to accelerated depreciation and Brent's spending habits. As such we find the trial court's determination that Brent's gross monthly income was $14,529 was in error and vacate the finding. On remand, the trial court must determine which business deductions were accelerated, remove them from consideration, and then determine from the nonaccelerated depreciation which amounts were reasonable and necessary to carry on the business. Any amount the trial court finds does not meet the reasonableness and necessary standard, may be imputed to Brent's income, at the court's discretion. We also leave it to the trial court's discretion to determine whether it wishes to impute the $257 related to the 113 acres pursuant to section 505(a)(3.1)(B) to Brent's gross monthly income of $7485.

¶ 70                                Kristi's Income

¶ 71    Brent argues that the trial court's finding that Kristi's income should not include the money received from her sale of Britton stock after finding this case was "more in the nature of shares of stock capable of being sold (*In re Marriage of Marsh*, 2013 IL App (2d) 130423), rather than

unvested stock options (*In re Marriage of Colangelo*, 355 Ill. App. 3d 383 (2005)).” Brent contends that the trial court's interpretation of *Marsh* was in error because, in that case, there was no “evidence or testimony that the sale yielded no profit or was otherwise sold at a loss.”

¶ 72    While Brent contends the trial court's decision was in error, Brent has not provided an adequate record for this court to address the issue. The trial court's June 16, 2020, docket entry reveals that arguments as to whether Kristi's income should include money from the sale of the stock were presented to the trial court on that date; however, no report of proceedings regarding this issue was included in the record on appeal. The appellant has the duty of presenting a complete record on appeal. *In re Marriage of Naylor*, 220 Ill. App. 3d 366, 370 (1991). The record on appeal shall consist of “the judgment appealed from, the notice of appeal, *** the entire original common law record,” and “any report of proceedings.” Ill. S. Ct. R. 321 (eff. Feb. 1, 1994). “Where a party desires to have a judgment reviewed it is incumbent upon him to present a record of the proceedings and judgments sufficient to show the errors of which he complains.” *Higgins v. Columbia Tool Steel Co.*, 76 Ill. App. 3d 769, 776 (1979).

¶ 73    Here, Brent contends that the agreement to sell the stock was “tendered to the Court and entered into evidence” but provides no cite to the record as to the location of this document contained within the 809 pages of exhibits or 482 pages comprising the common law record. Brent further contends that there “was no testimony as to the amount considered as the basis for the value of the stock and what she sold it for,” but the record fails to include the record of proceedings from the date of the argument or whether the trial court provided a rationale as to why this information may not have been necessary. In the absence of a sufficient record, “it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis.” *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984). “Any doubts which may arise from the

26

incompleteness of the record will be resolved against the appellant." *Id*. As such we affirm the trial court's ruling.

¶ 74                                  Child Support and Arrearage

¶ 75    Since the trial court's determination of Brent's gross monthly incomes was in error, we vacate its determinations for child support and arrearage. We remand the case back to the trial court to recalculate the appropriate child support and arrearage after determining the proper amount to impute to Brent's monthly gross income based with the nonaccelerated business deductions and whether it wishes to impute the $257 related to the 113 acres as in-kind income.

¶ 76                                  III. CONCLUSION

¶ 77    For the reasons stated herein, we vacate the trial court's orders requiring Brent to reimburse Kristi for her supplemental health insurance back to January 2018 pursuant to a rule to show cause hearing, affirm the trial court's order modifying the obligation to provide the children's health insurance, vacate the trial court's order making the educational expenses retroactive to a date prior to the filing of the petition, affirm the trial court's decision to impute income to Brent, vacate the trial court's calculation of Brent's gross and net income, affirm the trial court's finding that Kristi's sale of stock should not be included in her net income, vacate the trial court's orders regarding the amount of child support and arrearage due in this case, and remand the case to address the issues set forth herein in a manner consistent with this decision.

¶ 78    Affirmed in part and vacated in part; cause remanded.